Filed 1/21/14

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D061858 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD228655) |
| VO NGHIA SY, | |
| Defendant and Appellant. | |
| THE PEOPLE, | D062163 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD228655) |
| JACQUELINE DUENAS SY, | |
| Defendant and Appellant. | |

CONSOLIDATED APPEALS from judgments of the Superior Court of San Diego

County, Edward P. Allard III and Leo Valentine, Jr., Judges. Affirmed.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant Vo Nghia Sy.

Jill M. Klein, under appointment by the Court of Appeal, for Defendant and Appellant Jacqueline Duenas Sy.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric Swenson, Melissa Mandel and Charles C. Ragland, Deputy Attorneys General for Plaintiff and Respondent.

INTRODUCTION

Separate juries convicted Jacqueline Duenas Sy and Vo Nghia Sy[1] of selling or possessing counterfeit marks and found true allegations they sold or possessed 1,000 or more articles, or articles valued at more than $400, displaying or containing a counterfeit mark (Pen. Code,[2] § 350, subd. (a)(2)).[3] The court placed Jacqueline and Vo on summary probation for three years. The court granted Vo's motion to reduce his conviction to a misdemeanor (§ 17, subd. (b)). However, the court (a different judge) denied Jacqueline's motion to reduce her conviction to a misdemeanor, indicating it

---

[1] When referring to the Sys individually, we use their first names for clarity.

[2] Further statutory references are also to the Penal Code unless otherwise stated.

[3] The Sys were initially tried together. The first jury convicted Jacqueline, but was unable to reach a verdict on the charge against Vo and the court declared a mistrial as to him.

2

would reconsider the motion at a later time after ensuring Jacqueline complied with the terms of her probation and did not continue selling counterfeit goods.  The court later ordered Jacqueline and Vo to pay almost $43,000 in victim restitution.

On appeal, Jacqueline and Vo both contend there was insufficient evidence to support their convictions, the court committed instructional error, section 350 is unconstitutionally vague, and the court's victim restitution order was infirm in multiple respects.  Vo separately contends the court erred by refusing to consider the merits of his motion to disqualify the prosecution, or alternatively, by refusing to continue the motion so it could be heard on the merits.  Jacqueline separately contends the court erred by denying her motion to reduce her conviction to a misdemeanor.  We conclude there is no merit to any of these contentions and affirm the judgment.

## BACKGROUND[4]

*Prosecution Evidence–Both Trials*

The Sys had a business selling handbags, clothing, and jewelry.  The merchandise bore the names and logos of such designer brands as Chanel, Coach, Gucci, Louis Vuitton, Rock & Republic, Tiffany & Co. (Tiffany), and True Religion.  These brands are registered trademarks.  The Sys' merchandise was not authentic and they were not authorized retailers of the brands.

---

[4]     The Sys each filed motions requesting we take judicial notice of documents in the record of the other's appeal.  As we have consolidated the appeals for decision, the motions are moot.

3

An investigator for a private investigative company specializing in trademark, copyright, and patent infringement investigations went to a trade show in March 2010. Vo manned a booth there and the investigator saw two customers looking at purses underneath a table in the booth. The investigator inquired about purchasing some of the items. Vo gave him Jacqueline's business card and cell phone number. Vo told the investigator to call the number to arrange to purchase merchandise out of the Sys' hotel room. The investigator called the phone number and left a message, but never received a call back.

In April 2010 the investigator went to the Sys' store in San Diego. Jacqueline sold the investigator eight counterfeit items: one Coach handbag for $10, another Coach handbag for $15, a pair of True Religion jeans for $25, a pair of Rock & Republic jeans for $25, a Louis Vuitton wallet for $35, a Coach wallet for $10, and two Ed Hardy belts for $5 each.

Vo walked into the store as the investigator was leaving with his purchases. They discussed watches Vo had for sale. Vo had a case with watches bearing the brand names Chanel, TAG Heuer, Rolex, and Hublot. Vo opened the case and took out one of the watches. As he held it, he talked to the investigator about the quality and prices of the watches, which ranged from $150 to $200. He said he had better quality watches than Santee Alley, an area in Los Angeles where vendors and merchants are known to sell knockoff merchandise. He also said he did not have much merchandise at the time because "it was hard to get stuff from China," and customs had confiscated 35 cases of

4

True Religion jeans. Two weeks later, the investigator returned to the store and bought another pair of counterfeit True Religion jeans for $25.

Law enforcement officers subsequently searched the store. With assistance from the investigative company's employees, the officers seized over 13,000 counterfeit items.

*Additional Prosecution Evidence–Vo's Trial*

At the Las Vegas trade show, Vo kept certain purses under a table covered by a tablecloth. He pulled up the tablecloth to show the purses to customers and invited them to his hotel room for an "after-hours sale," where they could buy knockoff purses, clothes, and jewelry.

A customer saw a Chanel branded watch displayed at Vo's booth. The Chanel word mark[5] appeared on both the face and back of the watch, which to the customer meant the watch "reflects the brand of Chanel." The customer ordered one of the watches and picked it up at the Sys' store in San Diego. She paid $175 for it. A genuine Chanel watch of the same design would range in price from $5,250 to over $19,000, depending on the number of diamonds on it. No one told the customer the watch was genuine and she did not believe it was genuine because its back had a sticker rather than an engraved insignia. Instead, she thought she was buying "[s]omething that looked like a Chanel watch but was not actually a Chanel watch." The customer also purchased other items from the Sys. She associated all of the items with the brands they represented because of

_____

[5]     A word mark is a registered trademark consisting of a name or a word.

their look and feel and because they had very similar logos, but she did not believe the items were genuine.

Jacqueline told the investigator one of the purses he bought was a Coach purse. However, she did not say it was authentic and the investigator did not believe it was authentic.

Another customer bought a Chanel branded purse, a Coach branded purse, and a Tiffany branded necklace from Jacqueline. The customer paid $45 for the Coach purse. She knew it was not real because of the price and quality. She knew the Chanel purse and the Tiffany necklace were not real for similar reasons. She acknowledged, however, the logo on the Tiffany necklace was consistent with the logo Tiffany uses. The customer also arranged for the Sys to sell branded items at school fundraisers. She knew these items were fake as well.

Jacqueline was convicted of possessing or selling counterfeit goods. The Sys paid Coach $8,000 for using Coach's trademark without authorization.

*Defense Evidence—Jacqueline's Trial*

A family friend testified Jacqueline had a very good reputation in the community for being honest and she was a person whom he trusted. In addition, he testified he had purchased merchandise from Jacqueline and knew from the price and appearance the items were not real "except for the logos," which "looked like they were the real thing." Jacqueline also told him the merchandise was not real.

The family friend's wife testified she had purchased purses from Jacqueline on at least four occasions. Although the purses had brand names on them, she was never

6

confused about their authenticity.

A third customer of the Sys testified she purchased items from Jacqueline at a farmer's market and at the Sys' store. Although the items looked like branded merchandise, the customer was never confused about their authenticity because of their prices and "they looked a little cheaper." Jacqueline never told the customer the merchandise was real. She also never told the customer the merchandise was counterfeit. Regardless, the customer never believed the merchandise was real.

A fellow vendor at one of the farmer's markets where Jacqueline sold her merchandise testified she never saw Jacqueline sell branded items. When shown one of Jacqueline's counterfeit Louis Vuitton wallets, the vendor said she was not familiar with the brand and did not know what kind of wallet it was. When shown one of Jacqueline's counterfeit Tiffany items, the vendor stated she would not know off-hand whether it was actually a Tiffany item. However, she also stated, "I'm pretty sure, if it says 'Tiffany' engraved in it, I believe it's a Tiffany item." The vendor later explained, "I don't recognize brand name items just off the cuff. But once I saw the names and how they're written on them, I know those are brand items."

The manager of the farmer's market testified Jacqueline sold purses, clothes, jewelry and makeup at the market. Some of the purses had the Coach brand name on them. The manager was never confused about the authenticity of the purses because they did not look like genuine Coach purses and Jacqueline sold them for far less than what a genuine purse would cost.

*Defense Evidence–Vo's Trial*

Several people who dealt with the Sys testified Jacqueline never represented her items were genuine and they never believed her items were genuine.

DISCUSSION

I

*Insufficient Evidence Claims*

A

The Sys contend there was insufficient evidence to support their convictions because Jacqueline's customers were not confused about the authenticity of her merchandise. " 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" [Citation.]' [Citations.] The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there

8

sufficient substantial evidence to support [the conviction]." ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507-508.)

Section 350, subdivision (a), prohibits a person from willfully manufacturing, intentionally selling counterfeit marks, or knowingly possessing counterfeit marks for sale. A "counterfeit mark" is "a spurious mark that is identical with, or confusingly similar to, a registered mark and is used, or intended to be used, on or in connection with the same type of goods or services for which the genuine mark is registered." (§ 350, subd. (e)(3).) The mark does not have to be displayed on the outside of an article. (*Ibid.*) A " 'spurious mark' includes genuine marks used on or in connection with spurious articles and includes identical articles containing identical marks, where the goods or marks were reproduced without authorization of, or in excess of any authorization granted by, the registrant." (*Ibid.*) " 'Knowingly possess' means that the person possessing an article knew or had reason to believe that it was spurious, or that it was used on or in connection with spurious articles, or that it was reproduced without authorization of, or in excess of any authorization granted by, the registrant." (*Id.*, subd. (e)(4).)

Here, the evidence shows Jacqueline, as a principal, and Vo, as an aider and abettor, sold counterfeit items to numerous people at various venues. The items bore the word marks of such companies as Coach, Louis Vuitton, and Chanel. The evidence also shows law enforcement officers seized over 13,000 of these items from the Sys' San Diego store. Accordingly, there is ample evidence the Sys both intentionally sold and knowingly possessed counterfeit marks.

9

The fact the Sys' customers may not have been confused about the authenticity of the Sys' merchandise does not alter our conclusion. The statute proscribes the sale or possession for sale of either identical *or* confusingly similar marks. (§ 350, subds. (a) & (e)(3).) In this case, the evidence, including a comparison of certified copies of registered trademarks with the marks on the Sys' merchandise, shows the Sys' were selling and possessing for sale identical marks. The prosecutor, therefore, did not have to establish the marks were confusingly similar.[6]

The federal authorities relied upon by the Sys do not persuade us to the contrary. Federal law expressly requires a counterfeit mark to be likely to cause confusion or mistake, or to deceive. (15 U.S.C., § 1114, subd. (1) [civil]; 18 U.S.C., § 2320, subd. (f)(1)(A)(iv) [criminal].) Although California civil law contains the same requirement (Bus. & Prof. Code, § 14245, subd. (a)), section 350 does not. The Sys have not provided us with any authority indicating this distinction was other than purposeful. Thus, the federal authorities relied upon by the Sys offer us with no guidance in this matter.

B

The Sys also contend there is insufficient evidence to support their convictions because there was no evidence they ever intended to defraud or deceive anyone. Section 350, subdivision (a), proscribes the willful manufacturing, intentional selling, or knowing possession of counterfeit marks. While these mental states may suggest or

---

6      Although we do not rest our decision on this point, we note in Jacqueline's case there was some evidence the marks were confusingly similar as a fellow farmer's market vendor testified she believed one of the Sys' fake Tiffany items was actually from Tiffany because it had the Tiffany brand name on it.

encompass intent to defraud, intent to defraud is not an element of the offense. (See *People v. Dieguez* (2001) 89 Cal.App.4th 266, 279-280 [finding intent to defraud was " 'built into' " statutory language of Ins. Code § 1871.4, subd. (a)(1) because the specified mental states necessarily involved intent to defraud, making a separate element or instruction for intent to defraud unnecessary].)

*Rodriguez-Valencia v. Holder* (9th Cir. 2011) 652 F.3d 1157 and *Tall v. Mukasey* (9th Cir. 2008) 517 F.3d 1115 do not hold to the contrary. Rather, these cases hold that, for federal immigration law purposes, a violation of section 350, subdivision (a)(2), is an inherently fraudulent crime because the conduct of willfully manufacturing, intentionally selling, or knowingly possessing a counterfeit mark results in either an innocent purchaser being tricked into buying a fake item or the owner of the mark being deprived of its value. (*Rodriguez-Valencia v. Holder, supra*, 652 F.3d at p. 1160; *Tall v. Mukasey, supra*, 517 F.3d at pp. 1119-1120.) These cases do not discuss and, therefore, have no bearing on whether the prosecution must prove intent to defraud as an element of section 350.

C

Jacqueline separately contends there was insufficient evidence to support her conviction because the prosecutor did not prove she knew the marks on her items were counterfeit or, more particularly, that she knew the marks on her items were identical to or confusingly similar to registered marks. However, as Jacqueline repeatedly points out, all of her customers knew she was selling knockoffs. In addition, a family friend and customer of Jacqueline's testified the logos on Jacqueline's items "looked like they were

11

the real thing." Further, among the items law enforcement officers seized from the Sys' store were bins of metal plates engraved with designer logos that could be affixed to generic purses or wallets. A jury could reasonably infer from this evidence Jacqueline knew full well her items were identical to or confusingly similar to registered marks.

D

Jacqueline also separately contends there was insufficient evidence to support her conviction because the jury did not have any genuine marks to compare with the marks on her merchandise. Specifically, she contends the prosecution was not permitted to use certified copies of registered trademarks to prove its case and instead had to provide the jury with authentic merchandise bearing the registered trademarks for comparison. However, section 350 contains no such requirement and *United States v. Chong Lam* (4th Cir. 2012) 677 F.3d 190 (*Lam*), which Jacqueline cites to support her point, does not persuade us we must imply such a requirement.

In *Lam*, the prosecution sought to prove defendants were trafficking in counterfeit Burberry goods. (*Lam*, *supra*, 677 F.3d at p. 194.) The prosecution introduced evidence Burberry had registered its signature plaid pattern as a mark. The prosecution also introduced into evidence authentic handbags displaying this mark as well as samples of the allegedly counterfeit items, which displayed a similar, but not identical, plaid pattern. Consequently, before reaching its guilty verdict, the jury was able to make a side-by-side comparison of the authentic and allegedly counterfeit items. (*Id.* at pp. 195-197.) In concluding there was sufficient evidence to uphold defendants' convictions on appeal, the court pointed to and approved of the jury's side-by-side comparison, but the court never

considered whether a side-by-side comparison was *required* in that or any other case. (*Id.* at p. 200.) An opinion is not authority for a proposition not considered in it. (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2.)

Moreover, the *Lam* case is not factually analogous to this case because the jury in *Lam* was tasked with determining whether two different plaid patterns were substantially indistinguishable from one another. (*Lam*, *supra*, 677 F.3d at pp. 195-196.) It is not difficult to fathom why the jury may have needed to compare the actual plaid patterns to make this determination. In contrast, the jury in this case was tasked with determining whether the Sys' merchandise bore word marks identical to registered word marks. Jacqueline has not persuaded us the jury was unable to effectively accomplish this task by comparing the word marks on the Sys' merchandise to certified copies of the registered word marks.

II

*Instructional Error Claims*

A

There is no pattern jury instruction for a section 350 violation and the courts overseeing the Sys' trials crafted somewhat different instructions. In both cases, the courts instructed the juries that to establish a section 350 violation, the People had to prove the defendant intentionally sold or knowingly possessed a counterfeit mark. The courts also instructed the juries on the definitions of "knowingly possess," "counterfeit mark," and other terms not directly at issue in this appeal.

13

The court in Jacqueline's case further instructed the jury, "In order for a counterfeit mark to be identical to, or confusingly similar to, a registered mark, it does not matter that the specific persons who purchased the goods may not have been confused or deceived.  The test is whether the defendant's use of the mark was likely to cause confusion, mistake, or deception to the public in general.  In this regard, you should determine whether an average consumer would be deceived into believing that the product was made by the genuine trademark owner."  The court in Vo's case instructed the jury, " 'Confusingly similar' is to be measured by the standard of a reasonable consumer."

Vo's defense counsel crafted his own substantially different instruction, which he requested the court give.  Among its differences, the requested instruction included the factors used by the Ninth Circuit to aid a jury in determining whether a defendant's use of a trademark was likely to cause confusion about the source of the goods.  The court declined to give the instruction, finding it did not accurately state the applicable law and the court's own instruction was adequate.

B

1

Vo contends the court erred in failing to give his requested instruction because it pinpointed his theory of defense.  " ' "[T]he trial court normally must, even in the absence of a request, instruct on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case."  [Citation.]  In addition, "a defendant has a right to an instruction that pinpoints the theory of the

14

defense . . . ." ' [Citation.] The court, however, 'may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence [citation].' " (*People v. Bivert* (2011) 52 Cal.4th 96, 120.) As we previously explained, while federal law and California civil law specifically require a counterfeit mark to be likely to cause confusion or mistake, or to deceive, California criminal law does not. (Compare 15 U.S.C., § 1114, subd. (1); 18 U.S.C., § 2320, subd. (f)(1)(A)(iv); & Bus. & Prof. Code, § 14245, subd. (a) with § 350.) Therefore, the court properly declined to give Vo's instruction as it misstated the law and would have potentially confused the jury.

## 2

### a

The Sys both contend the courts' instructions were deficient in multiple respects. " '[A] claim that a court failed to properly instruct on the applicable principles of law is reviewed de novo. [Citation.] In conducting this review, we first ascertain the relevant law and then "determine the meaning of the instructions in this regard." [Citation.] [¶] The proper test for judging the adequacy of instructions is to decide whether the trial court "fully and fairly instructed on the applicable law . . . ." [Citation.] " 'In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. [Citation.]' " [Citation.] "Instructions should be interpreted, if possible, so as to

15

support the judgment rather than defeat it if they are reasonably susceptible to such interpretation." ' " (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1311-1312.)

Jacqueline contends the court's instruction in her case was prejudicially deficient because it failed to inform the jury the prosecution had to prove Jacqueline's use of counterfeit marks was likely to cause confusion. Several of Vo's claimed instructional deficiencies are similarly premised on the assertion the likelihood of confusion, mistake, or deception is an implied element of a section 350 violation. As we have rejected this assertion, we must necessarily reject any claims premised on it.

b

Vo also contends the court erred by failing to instruct the jury the prosecutor had to prove Vo possessed or sold a counterfeit mark with the intent to defraud the mark holder or an innocent purchaser. Jacqueline raises substantially the same claim. As we have rejected the contention that intent to defraud is an element of a section 350 violation, we must necessarily reject any contention the court was required to instruct the jury on this element.

c

Vo further contends the court prejudicially erred by instructing the jury Vo was charged with the "sale or possession for sale of counterfeit *goods* in violation of [section 350, subdivision (a)(2)]," (italics added) instead of the sale or possession of counterfeit *marks*. We disagree.

While the court may have misdescribed the charge against Vo, it accurately informed the jury the charge required the People to prove Vo intentionally sold a

16

counterfeit *mark* or knowingly possessed a counterfeit *mark* for sale and Vo knew the *mark* was counterfeit. The court also defined the term "counterfeit *mark*" for the jury. Consequently, Vo has not established there was a reasonable likelihood the jury misconstrued or misapplied the instruction in the manner claimed. (*People v. Mathson*, *supra*, 210 Cal.App.4th at p. 1312.)

### III

### *Vagueness Claim*

The Sys contend section 350 is unconstitutionally vague because it does not require an intent to defraud or a likelihood the use of the mark created confusion, mistake, or deception about the origin of the product. We conclude otherwise.

"A penal statute must define the offense with sufficient precision that 'ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.' [Citations.] 'The constitutional interest implicated in questions of statutory vagueness is that no person be deprived of "life, liberty, or property without due process of law," as assured by both the federal Constitution (U.S. Const., Amends. V, XIV) and the California Constitution (Cal. Const., art. I, § 7).' [Citation.]

"To satisfy the constitutional command, a statute must meet two basic requirements: (1) the statute must be sufficiently definite to provide adequate notice of the conduct proscribed; and (2) the statute must provide sufficiently definite guidelines for the police in order to prevent arbitrary and discriminatory enforcement. [Citations.] Only a reasonable degree of certainty is required, however. [Citation.] The analysis

begins with 'the strong presumption that legislative enactments "must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears. [Citations.] A statute should be sufficiently certain so that a person may know what is prohibited thereby and what may be done without violating its provisions, but it cannot be held void for uncertainty if any reasonable and practical construction can be given to its language." ' " (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1106-1107.)

Section 350's application is limited to the *willful* manufacturing, *knowing* possession, or *intentional* selling of a counterfeit mark. (§ 350, subd. (a).) "Counterfeit mark" is limited to a mark that is identical with or confusingly similar to a registered mark *and is used or is intended to be used* on or in connection with the same type of goods or services as the registered mark. (§ 350, subd. (e)(3).) Section 350's limited reach and explicit scienter requirements provide both adequate notice of the proscribed conduct and protection against arbitrary and discriminatory enforcement. (*People v. Superior Court* (*Caswell*) (1988) 46 Cal.3d 381, 390-392 [presence of scienter requirement generally precludes vagueness problems]; *People v. Maxwell* (1994) 30 Cal.App.4th 783, 800 [same].) Thus, we conclude section 350 is sufficiently definite to satisfy the constitutional requirements.

As with many of their other contentions, the Sys premise their vagueness claim on their assertion the statute should include intent to defraud and likelihood of consumer confusion requirements. However, they have not demonstrated the Legislature intended to include these requirements in the statute or that the Legislature was obliged to make California criminal law coextensive with federal law or California civil law in this area.

18

More to the point for this claim, they have not demonstrated inclusion of these requirements is necessary to clarify existing language as opposed to adding new language favorable to their positions. It is the state legislature's province to define the elements of and determine the appropriate penalties for state crimes. (*People v. Malfavon* (2002) 102 Cal.App.4th 727, 737.) " 'The judiciary ordinarily has no power to insert in a statute an element the Legislature has omitted [citation]' [citation]; where, as here, the statute has an appropriate mens rea requirement, 'no reason appears . . . to warrant departure from this rule.' " (*People v. Hagedorn* (2005) 127 Cal.App.4th 734, 744.) As the California Supreme Court has repeatedly observed, " ' " 'the power to define crimes and fix penalties is vested exclusively in the legislative branch.' [Citations.]" ' [Citation.] The courts may not *expand* the Legislature's definition of a crime [citation], nor may they *narrow* a clear and specific definition." (*People v. Farley* (2009) 46 Cal.4th 1053, 1119.)

IV

*Restitution Claim*

A

As a condition of probation, the court ordered the Sys to pay victim restitution in amounts to be determined. After subsequent restitution hearings, the court ordered the Sys to pay trademark holders $19,126 for loss of sales as follows: Breitling Lane, $350; Jimmy Choo, $65; TAG Heuer, $182; Burberry, $533; Chanel, $5,762; Dolce & Gabbana, $234; Ed Hardy, $658; Gucci, $204; Juicy Couture, $517; Louis Vuitton, $9,416; Prada, $625; Rolex, $500; and Tiffany, $80. The amounts were based on documents evidencing actual sales by the Sys to their customers. The amounts were not

19

based on the Sys' inventory.  The court also ordered the Sys to reimburse trademark holders over $23,000 for investigation costs.

B

1

The Sys challenge the restitution award on numerous grounds.  Before addressing their challenges, we summarize the law applicable to our review.

The California constitution gives crime victims a right to restitution and, consequently, requires a court to order a convicted wrongdoer to pay restitution in every case in which a crime victim suffers a loss.  (Cal. Const., art. I, § 28, subd. (b)(13)(B).)  To implement this requirement, section 1202.4, subdivision (f), generally provides that "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court."

A victim includes "[a] corporation, business trust, estate, trust, partnership, association, joint venture, government, governmental subdivision, agency, or instrumentality, or any other legal or commercial entity when that entity is a direct victim of a crime."  (§ 1202.4, subd. (k)(2).)  A direct victim is a victim against whom a defendant has committed a crime.  (*People v. Anderson* (2010) 50 Cal.4th 19, 28.)

The restitution amount "shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct."  (§1202.4, subd. (f)(3).)  "The defendant has the

20

right to a hearing before a judge to dispute the determination of the amount of restitution."  (§ 1202.4, subd. (f)(1).)

"At a victim restitution hearing, a prima facie case for restitution is made by the People based in part on a victim's testimony on, or other claim or statement of, the amount of his or her economic loss.  [Citations.]  'Once the victim has [i.e., the People have] made a prima facie showing of his or her loss, the burden shifts to the defendant to demonstrate that the amount of the loss is other than that claimed by the victim. [Citations.]'  [Citation.]

" 'The standard of review of a restitution order is abuse of discretion.  "A victim's restitution right is to be broadly and liberally construed."  [Citation.] " 'Where there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court.' "  [Citations.]'  [Citation.]  However, a restitution order 'resting upon a " 'demonstrable error of law' " constitutes an abuse of the court's discretion.  [Citation.]'  [Citation.]  'In reviewing the sufficiency of the evidence [to support a factual finding], the " 'power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the trial court's findings."  [Citations.]  Further, the standard of proof at a restitution hearing is by a preponderance of the evidence, not proof beyond a reasonable doubt.  [Citation.]  "If the circumstances reasonably justify the [trial court's] findings," the judgment may not be overturned when the circumstances might also reasonably support a contrary finding.  [Citation.]  We do not reweigh or reinterpret the

evidence; rather, we determine whether there is sufficient evidence to support the inference drawn by the trier of fact. [Citation.]' [Citation.]

" '[T]he court's discretion in setting the amount of restitution is broad, and it may use any rational method of fixing the amount of restitution as long as it is reasonably calculated to make the victim whole. [Citations.]' [Citations.] 'There is no requirement the restitution order be limited to the exact amount of the loss in which the defendant is actually found culpable, nor is there any requirement the order reflect the amount of damages that might be recoverable in a civil action.' " (*People v. Millard* (2009) 175 Cal.App.4th 7, 26-27.)

2

First, the Sys contend the court abused its discretion by ordering them to pay victim restitution to the trademark holders because the trademark holders were not direct victims within the meaning of section 1202.4, subdivision (k)(2). We need not decide whether the trademark holders were direct victims in this case because section 350, subdivision (i), expressly provides: "When a person is convicted of an offense under this section, *the court shall order the person to pay restitution to the trademark owner* and any other victim of the offense pursuant to Section 1202.4." (Italics added.) Thus, the court was obliged to order the Sys to pay victim restitution to the trademark holders regardless of whether the trademark holders were direct victims.

3

The Sys next contend the court should not have awarded the trademark holders investigative costs because these costs were unrecoverable law enforcement costs. We

22

disagree. Although a public agency generally may not recover law enforcement costs under section 1202.4 (*People v. Ozkan* (2004) 124 Cal.App.4th 1072, 1076-1077), a victim may recover out-of-pocket expenses for assisting with the investigation and prosecution of the victim's case as these "expenses clearly constitute 'economic loss incurred as the result of the defendant's criminal conduct.' " (*People v. Ortiz* (1997) 53 Cal.App.4th 791, 797-798; see also *People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1182-1183 & fn. 9; *People v. Maheshwari* (2003) 107 Cal.App.4th 1406, 1409, 1411.)

4

The Sys additionally contend the amount awarded for investigative costs was excessive because most of the costs were incurred after the preliminary hearing, when the bulk of the investigative company's work should have been completed. They further contend the investigative company's work did not warrant the hourly rate the agency charged the trademark holders. These are matters upon which the Sys had the burden of proof below. (*People v. Millard*, *supra*, 175 Cal.App.4th at p. 26 [defendant has the burden of proving the amount of loss is other than the victim claims].) The record shows the investigation company submitted invoices and other documents detailing the basis for their fees. Conversely, the record does not show the Sys presented any evidence the investigative company billed for work it did not actually perform or charged above-market rates for its services. Accordingly, the Sys have not established the amount of restitution ordered for investigative costs was an abuse of discretion.

23

The Sys further contend the court erred in awarding restitution to some of the trademark holders, such as Breitling, because the prosecutor did not present any trial evidence showing these companies had registered marks or that the Sys used the marks without authorization.  According to the Sys, awarding restitution to these trademark holders violated their constitutional rights to notice and a jury's determination of the facts.

Generally, restitution under section 1202.4 is limited to losses arising from the criminal conduct that formed the basis for the defendant's conviction.  (*People v. Woods* (2008) 161 Cal.App.4th 1045, 1049.)  However, "[t]his limitation does not apply in the context of grants of probation.  'California courts have long interpreted the trial courts' discretion to encompass the ordering of restitution as a condition of probation even when the loss was not necessarily caused by the criminal conduct underlying the conviction. Under certain circumstances, restitution has been found proper where the loss was caused by related conduct not resulting in a conviction [citation], by conduct underlying dismissed and uncharged counts [citation], and by conduct resulting in an acquittal [citation].' "  (*Id.* at p. 1050, citing *People v. Carbajal* (1995) 10 Cal.4th 1114, 1121; accord *People v. Anderson* (2010) 50 Cal.4th 19, 27.)  We review an award of restitution imposed as a condition of probation to determine whether it is arbitrary, capricious or otherwise exceeds the bounds of reason under the circumstances.  (*People v. Anderson*, *supra*, at p. 32.)

Here, the court stated in its orders granting probation that the Sys would be required to make restitution for the actual damages they caused all of their victims in an amount to be determined at a restitution hearing. The Sys had notice of their potential victims' identities from the merchandise law enforcement officers seized from their store. They also had notice from the People's restitution memo, which identified the trademark holder victims and their claimed losses and was supported by the Sys' sales receipts. The record does not show the Sys presented any evidence challenging any company's status as a victim, whether because the company did not hold a registered mark or because the company had authorized the Sys to use its mark. We, therefore, cannot conclude the court's restitution award was arbitrary, capricious, or exceeded the bounds of reason under the circumstances. (*People v. Anderson*, *supra*, 50 Cal.4th at p. 32.)

Moreover, the fact the court awarded restitution without a jury trial poses no constitutional concerns. As we have previously held, the court's determination of a restitution amount does not implicate a defendant's jury trial rights. (*People v. Millard*, *supra*, 175 Cal.App.4th 7, 36; see also, *People v. Chappelone*, *supra*, 183 Cal.App.4th at pp. 1183-1184.)

V

*Reduction of Offense Claim*

A

Jacqueline moved under section 17, subdivision (b), to reduce her conviction to a misdemeanor, arguing the nature and circumstances of the offense, her remorse for it, and her character supported the reduction. The court denied the motion, indicating it would

25

reconsider the motion at a later time after ensuring Jacqueline complied with the terms of her probation and did not continue selling counterfeit marks. Jacqueline contends the court abused its discretion by denying her motion.

B

A violation of section 350, subdivision (a)(2) is a "wobbler" offense in that a court has the discretion to sentence the crime as either a felony or a misdemeanor. (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 974.) A court had broad discretion under section 17, subdivision (b) in deciding whether to reduce a wobbler offense to a misdemeanor. (*People v. Superior Court* (*Alvarez*), *supra*, at p. 977.) We will not disturb the court's decision on appeal unless the party attacking the decision clearly shows the decision was irrational or arbitrary. (*Ibid*.) Absent such a showing, we presume the court acted to achieve legitimate sentencing objectives. (*Id*. at pp. 977-978.)

Here, the court considered Jacqueline's motion and determined it was too soon to reduce her conviction. The court indicated it wanted an opportunity to consider her performance on probation before granting her request to ensure she did not resume selling counterfeit marks. Nothing about the court's stated reasons for denying her motion indicate its decision was irrational or arbitrary, and Jacqueline has not clearly shown to the contrary.

Although the court (different judge) granted Vo's motion to reduce his conviction to a misdemeanor, this does not show the court acted irrationally or arbitrarily in Jacqueline's case. We will not reverse the court's decision " 'merely because reasonable people might disagree. "An appellate tribunal is neither authorized nor warranted in

26

substituting its judgment for the judgment of the trial judge." ' " (*People v. Superior Court* (*Alvarez*), *supra*, 14 Cal.4th at p. 978.)

Further, the record shows Jacqueline played more of an active role in selling and possessing the counterfeit marks than Vo. In fact, she testified at his trial he had no substantive involvement in the ownership or operation of her business. Under such circumstances, we cannot conclude the court acted irrationally or arbitrarily in waiting to grant her motion to reduce her conviction until after it ensured she complied with her probation and did not resume her unlawful business operations.

VI

*Denial of Recusal Motion*

A

Before the restitution hearing, Vo moved to retroactively disqualify the district attorney's office from the case, arguing the office had a disabling conflict of interest because the victims, through the investigative company, financed many expenses, including investigative expenses and witness fees, normally borne by the prosecution. The court denied the motion without prejudice because the attorney general had not been served with a copy of it and it was not supported by a declaration.

B

Vo contends the court erred by refusing to consider the merits of the motion because the submission of an affidavit would have been futile as the court already had competent evidence before it and the attorney general appeared at the hearing, indicating

27

the attorney general had actual notice of the motion.  Alternatively, Vo contends the court should have continued the hearing to allow the attorney general to file an opposition.

1

A court may not grant a motion to disqualify a district attorney unless "the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial."  (§ 1424, subd. (a)(1).)  "[S]ection 1424 sets out a two-part test for determining whether recusal is appropriate.  Under the first part, a court must determine whether a conflict exists, that is, whether 'the circumstances of a case evidence a reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner.' [Citations.]  If such a conflict exists, the court must further determine whether the conflict is ' " 'so grave as to render it unlikely that defendant will receive fair treatment during all portions of the criminal proceedings.' " ' [Citation.]  Thus, the first half of the inquiry asks only whether a 'reasonable possibility' of less than impartial treatment exists, while the second half of the inquiry asks whether any such possibility is so great that it is more likely than not the defendant will be treated unfairly during some portion of the criminal proceedings."  (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 713-714.)  "Section 1424 'does not allow disqualification merely because the district attorney's further participation in the prosecution would be unseemly, would appear improper, or would tend to reduce public confidence in the impartiality and integrity of the criminal justice system.' [Citations.]  Only an *actual likelihood of unfair treatment*, not a subjective perception of impropriety, can warrant a court's taking the

28

significant step of recusing an individual prosecutor or prosecutor's office." (*Haraguchi*, at p. 719.)

We review trial court rulings on recusal motions for abuse of discretion. (*Hollywood v. Superior Court* (2008) 43 Cal.4th 721, 728.) "Accordingly, we ask whether the trial court's findings of fact are supported by substantial evidence, whether its rulings of law are correct, and whether its application of the law to the facts was neither arbitrary nor capricious. [Citation.]" (*People v. Superior Court* (*Humberto S.*) (2008) 43 Cal.4th 737, 746 (*Humberto S.*).)

2

Section 1424 requires the defendant serve a motion to disqualify on the district attorney and the attorney general at least 10 court days before the motion is heard. (§ 1424, subd. (a)(1).) The motion must include a statement of the facts setting forth the grounds for the disqualification and the legal authorities relied upon. In addition, the motion must be supported by the affidavits of competent witnesses. (*Ibid.*) The district attorney and the attorney general may file affidavits opposing the motion, may appear at the hearing on the motion, and may file a written opinion on the disqualification issue. (*Ibid.*) The court must review the affidavits and determine whether or not an evidentiary hearing is necessary. (*Ibid.*)

In this case, there is no question Vo's motion was procedurally infirm. Vo did not serve his motion on the attorney general and he did not support it with affidavits or other competent evidence as required by section 1424, subdivision (a)(1). The attorney general's appearance at the motion hearing did not obviate these infirmities. The district

attorney apprised the attorney general of the motion hearing and the attorney general appeared at it solely to assert a procedural objection. The attorney general did not file an opposition to the motion and there is no basis in the record for us to reasonably infer the attorney general had an adequate opportunity to prepare one. Unlike the district attorney, the attorney general had no familiarity with the case or with the evidence Vo referenced in, but did not supply with, his motion. Moreover, we are not aware of any authority obliging a party to expend resources responding to an improperly noticed motion. Accordingly, we are unable to conclude it was futile for the court to require compliance with section 1424's procedural requirements or that it abused its discretion by doing so.

For similar reasons, we cannot fault the court for failing to continue the matter to allow the attorney general to respond. The attorney general did not specifically request a continuance. Rather, the attorney general expressly declined to waive its procedural objection and requested an opportunity to respond only if the court decided to hear the motion on the merits. As the attorney general's objection was well taken and curing the procedural defects required both service on the attorney general and the submission of supporting evidence, we conclude the court did not abuse its discretion by opting to deny the motion without prejudice instead of continuing the matter.

3

Even if the court had erred by failing to consider the merits of or to continue the hearing on the disqualification motion, the error was harmless. As explained in *Hambarian v. Superior Court* (2002) 27 Cal.4th 826 (*Hambarian*), the California Supreme Court determined in *People v. Eubanks* (1996) 14 Cal.4th 580 (*Eubanks*) that a

30

trial court may properly order the recusal of a district attorney's office "which, when faced with a ' "substantial" ' debt for consultants in comparison to its resources, had asked the victim to pay the debt as well as 'other significant costs of the investigation.' [Citation.] Focusing on 'the possible sense of obligation the district attorney would feel for [the victim's] payment of a debt owed by the district attorney's office,' [the Supreme Court] held that '[t]he trial court did not err in concluding these circumstances evidenced a "reasonable possibility" the prosecutor might not exercise his discretionary functions in an evenhanded manner' and would not have abused its discretion 'in finding the conflict so grave as to render fair treatment of the defendants in all stages of the criminal proceedings unlikely.' " (*Hambarian v. Superior Court* (2002) 27 Cal.4th 826, 829.)

However, the Supreme Court subsequently clarified a district attorney is not subject to recusal whenever a defendant shows a victim financially assisted the district attorney with the investigation of the victim's case. (*Hambarian*, *supra*, 27 Cal.4th at pp. 834, 836.) Instead, the defendant must "show that the financial assistance is of 'a nature and magnitude likely to put the prosecutor's discretionary decisionmaking within the influence or control of an interested party.' " (*Id.* at p. 835.) The likelihood existed in *Eubanks* because the district attorney's office was experiencing serious budgetary constraints and had asked the victim to discharge a sizable debt the office had previously incurred. Such circumstances raised the concern the office would have had difficulty informing the victim if it decided not to prosecute the victim's case. (*Hambarian*, at pp. 835-836.)

31

Vo did not provide any evidence the trademark holders' financial assistance in this case was of a nature and magnitude to create any comparable sense of obligation on the district attorney's office's part. Specifically, he did not provide any evidence the office asked the trademark holders to discharge a preexisting debt or for any other specific financial assistance. In addition, he did not provide any evidence the trademark holders used or attempted to use their financial assistance to influence the office's discretionary decisionmaking. He also did not provide any evidence the trademark holders' financial assistance, relative to the office's own financial resources, caused the office to make or feel obliged to make discretionary decisions it otherwise would not have made.

Vo's assertion the financial assistance prompted the office to pursue an otherwise weak case is wholly unpersuasive. There is no doubt from the evidence Jacqueline was actively engaged in selling goods with counterfeit marks. The only question as to Vo was the degree of his involvement in the enterprise and the additional documentary and testimonial evidence presented at his second trial amply supported the jury's finding he aided and abetted Jacqueline. Although the Sys did not, and may still not, view their conduct as criminal, it fell squarely within the ambit of section 350 and a prosecutor may not be disqualified simply for zealously pursuing convictions. " 'Zealous advocacy in pursuit of convictions forms an essential part of the prosecutor's proper duties and does not show the prosecutor's participation was improper.' [Citation] ' "In an adversary system, [prosecutors] are necessarily permitted to be zealous in their enforcement of the law." [Citation.] So long as their zeal remains within legal limits . . . the lawful execution of their duty does not establish as a matter of law that they have surrendered

32

their independence and impartiality.' " (*People v. Superior Court* (*Humberto S.*), *supra*, 43 Cal.4th at p. 747.)  Accordingly, Vo has not established he would have received a more favorable result absent the claimed error.  (*People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Vasquez* (2006) 39 Cal.4th 47, 66-71 [holding *Watson* standard applies to an erroneous denial of a section 1424 motion].)

## DISPOSITION

The judgment is affirmed.


MCCONNELL, P. J.

WE CONCUR:


NARES, J.


McINTYRE, J.