Filed 2/27/15  P. v. Torres CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GABRIEL RUBEN TORRES,<br><br>    Defendant and Appellant. | A142479<br><br>(Sonoma County<br>Super. Ct. No. SCR-642073) |

Defendant was charged with two counts of second degree burglary.  Following defendant's plea of no contest to one count of second degree burglary and admission of a prior strike, the trial court sentenced him to state prison and ordered restitution.  On appeal, defendant challenges the restitution award of $5,125, asserting there was insufficient evidence the claimed loss was the result of defendant's commission of the burglaries.  Because substantial evidence links defendant to the loss, we find the trial court did not abuse its discretion and affirm the order of restitution.

## I.  STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

The following factual summary is taken from a Sonoma County Sheriff's Office investigation report received into evidence at the restitution hearing.

On November 4, 2013, at approximately 8:00 a.m., Jason Passalacqua arrived at the residence owned by his father, Thomas Passalacqua,[1] located on Mill Creek Road, to

---

[1] To avoid confusion, we refer to Thomas and Jason Passalacqua by their first names.

compile a list of repairs to be completed before renting the house. In addition to the house, a garage and a large barn just south of the house were located on the property.

When Jason arrived at the house, he entered through the front door which is always left unlocked. Shortly thereafter, he heard the sound of a car door closing and an engine starting up at the back of the house. Jason was concerned because the house had been burglarized several weeks earlier. He left through the front door, placed his dog in his truck, and grabbed his hunting shotgun. He then walked around the south side of the residence to the back where he saw defendant standing next to the driver's door of a grey Chevrolet S-19 pickup and another individual, Jason Bulcke, sitting in the front passenger seat. Jason asked both men what they were doing there. Both responded they had been hired by someone in Fulton who told them to clean out the house and place the contents in the garage. Defendant and Bulcke also admitted they had been inside the house. Because Jason was unsure whether his father had hired a third party to clean out the house, he called Thomas, who stated he had not hired anyone. Thomas arrived at the house as Jason was calling the sheriff's office.

When Deputies Greg Quacchia and John Blenker arrived at the residence, Jason and Thomas, as well as defendant and Bulcke, were present. Thomas showed Deputy Quacchia several household items inside the garage which he said had been inside the house, including a mirror, medicine cabinet, rolls of carpet, briefcase, black lamp, two small wooden tables, and a wicker basket wrapped around a glass bottle. Next to the household items were a Stihl chainsaw, an orange-colored wood router, and four flat plastic boxes. Thomas indicated the tools did not belong to him and were possibly the property of Richard Ehrenreich, who rented the large barn on the property for use as a workshop.

Quacchia, Thomas, and Jason entered the uninhabited house to check the interior. Thomas was last inside the house two days earlier. With the exception of a few items of miscellaneous furniture, the house was empty. Thomas and Quacchia found a dryer sitting in the middle of the doorway leading out to the backyard; however, according to Thomas, the dryer had been located against the wall near the door.

Deputy Blenker walked to the barn where he observed a lock securing the barn door had been pried off the hasp. The barn had many valuable tools, and it appeared to him as if "person(s) were piling items in bins to steal them." He also saw tools piled near the garage.

Blenker knew defendant and Bulcke from previous contacts and arrests over the past 15 years. At the time of this incident, defendant was on probation. Defendant told Blenker he was hired by a man named Mike to clean up the property.

Defendant provided Quacchia with further information about Mike. He stated he had driven to Fulton in his father's Chevrolet pickup to look for work. While parked behind the "Egg Basket," he was walking around with other day laborers when he was contacted by a White male, named Mike, who hired him to clean out a house. After defendant picked up Bulcke, they followed Mike to the house. Upon arriving at the house, Mike instructed defendant and Bulcke to empty the house of its contents and move them to the garage behind the house. Mike then left in his truck stating he would return at noon. Defendant admitted he had carried a mirror out of the house to the garage and had moved the dryer, but claimed the other items were already stacked outside the back door when he had arrived that morning.

Quacchia spoke separately with Bulcke who said he had received a telephone call from defendant asking if he wanted to do some work. Contrary to defendant's statement that he picked up Bulcke, Bulcke told Quacchia he got a ride to the house from someone named Alexis. Bulcke denied entering the house or barn, or moving any of the items in the garage.

After defendant and Bulcke were placed under arrest for burglary, Quacchia requested a tow truck to remove defendant's pickup truck from the property. During an inventory search, he saw on the truck seat an unopened bottle of "1984 Alexander's Crown Vineyard, Cabernet Sauvignon."

Quacchia returned to the property at 11:30 a.m. and remained there until 12:20 p.m. to see if Mike would return. During this time period, neither Mike nor any other persons arrived or left the property.

3

Ehrenreich arrived at the property at approximately 1:15 p.m. in response to Deputy Quacchia's call. He observed damage to the frame around the sliding door to his workshop located in the barn. This damage had not been there two days earlier on November 2, 2013 at 10:00 a.m., the last time he stood outside his shop. However, he had not been inside the workshop since October 27, 2013.

Quacchia and Ehrenreich walked to the garage where Ehrenreich identified his Stihl chainsaw, the wood router, and four plastic containers and their contents. All of the items had been stored inside his workshop. After returning to the workshop, Ehrenreich noted several welders and saws were missing. Inside his workshop, Ehrenreich pointed out a bottle of wine covered with dust sitting on a work bench. He stated the wine did not belong there and had been stored in another part of the shop. Quacchia noticed it was a bottle of 1987 Rodney Strong cabernet sauvignon. In a back storage room, Ehrenreich also pointed out a wood box and a cardboard box on the floor containing several bottles of wine. The floor area had been clear of obstructions, and the bottles had been stored in a third box on a nearby shelf. The label on one of the bottles matched the one Quacchia saw in defendant's truck, " 'Rodney Strong, 1984 Alexander's Crown Vineyard, Cabernet Sauvignon.' "

Blenker conducted a probation search of defendant's residence. He knew numerous valuable welding tools were stolen from Ehrenreich's workshop, but he found none of the missing items described to him by Quacchia.

Defendant was charged in an information with two counts of second degree burglary. (Pen. Code,[2] § 459.) The information alleged a prior strike (§ 1170.12) and two prior prison terms (§ 667.5, subd. (b)). Defendant pleaded no contest to one count of second degree burglary and admitted the prior strike.

The trial court sentenced defendant to 32 months in state prison and ordered him to pay Ehrenreich victim restitution in the amount of $5,125. Several months later, defendant filed opposition to the restitution order. Prior to the contested restitution

---

[2] All statutory references are to the Penal Code.

hearing, Ehrenreich submitted a declaration requesting $7,943.12, the amount of the replacement costs for various missing tools. He attached a list of the tools and their replacement value along with supporting documentation. However, he estimated the depreciated value of the items to be $5,125.[3] Following a contested restitution hearing, the trial court ordered defendant to pay victim restitution in the amount of $5,125.

## II.  DISCUSSION

Defendant challenges the restitution award. Before addressing his challenge, we summarize the evidence presented at the restitution hearing and the law applicable to our review.

### A.  *Background*

At the restitution hearing Ehrenreich testified he maintained a workshop in a barn 100 yards up the hill from the Mill Creek Road residence. He kept power and simple tools, equipment, and raw materials for his artwork. On November 4, 2013, after he learned his workshop had been burglarized, he returned to the property around noon to meet with a deputy sheriff. As soon as he pulled up to the workshop, "it was obvious" the locks and hasps had been "ripped off" the door to his workshop. Additionally, the wood around the locks and hasps was "splintered and broken." The last time Ehrenreich had been at the workshop prior to the burglary was two days before the burglary.

Ehrenreich further testified he discovered tools missing from his workshop including two welders, a set of torches, two chainsaws, two grinders, and "a bunch of carving tools." Inside the garage adjacent to the residence, he saw a few of his tools, including a chainsaw. Those tools had been locked up in his workshop two days earlier.

Ehrenreich also told the court he had been going to the property "every couple of days, sometimes every other day," and no one lived in the residence at the time of the burglaries. Two weeks before this incident, there was a burglary or suspicious activity at the main residence, but his workshop was not burglarized.

---

[3] Evidently, Ehrenreich sent a letter to the court on an unknown date estimating the depreciated value of the missing tools as $5,125.

As noted above, in addition to Ehrenreich's testimony, the police report of the incident was received in evidence.

At the conclusion of the hearing, the prosecutor argued the evidence raised the reasonable inference defendant and Bulcke were making multiple trips to transport property. There was a single point of entry into the workshop, Ehrenreich had been at the workshop two days prior, wine from the workshop was found in defendant's truck, property had been moved from the workshop to the garage, and the workshop had never before been burglarized. Defendant's counsel argued defendant and Buckle were caught at the scene in possession of all of the property taken from the buildings, and Ehrenreich's missing property must have been "taken at some other time from some other burglary that wasn't charged." Bulcke's counsel commented there was no evidence of multiple trips.

The trial court ordered victim restitution in the amount of $5,125, Ehrenreich's estimate of the depreciated value of the missing tools.

## B. *Applicable Law*

"The California Constitution gives crime victims a right to restitution, and consequently, requires a court to order a convicted wrongdoer to pay restitution in every case in which a crime victim suffers a loss. (Cal. Const., art. I, § 28, subd. (b)(13)(B).) To implement this requirement, section 1202.4, subdivision (f), generally provides that 'in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court.' " (*People v. Sy* (2014) 223 Cal.App.4th 44, 62.)

"The restitution amount 'shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct.' (§ 1202.4, subd. (f)(3).) 'The defendant has the right to a hearing before a judge to dispute the determination of the amount of restitution.' (§ 1202.4, subd. (f)(1).)

" 'At a victim restitution hearing, a prima facie case for restitution is made by the People based in part on a victim's testimony on, or other claim or statement of, the amount of his or her economic loss. [Citations.] "Once the victim has [i.e., the People have] made a prima facie showing of his or her loss, the burden shifts to the defendant to demonstrate that the amount of the loss is other than that claimed by the victim. [Citations.]" [Citation.]

" ' "The standard of review of a restitution order is abuse of discretion. 'A victim's restitution right is to be broadly and liberally construed.' [Citation.] ' "Where there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court." ' [Citations.]" [Citation.] However, a restitution order "resting upon a ' "demonstrable error of law" ' constitutes an abuse of the court's discretion. [Citation.]" [Citation.] "In reviewing the sufficiency of the evidence [to support a factual finding], the ' "power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the trial court's findings.' [Citations.] Further, the standard of proof at a restitution hearing is by a preponderance of the evidence, not proof beyond a reasonable doubt. [Citation.] 'If the circumstances reasonably justify the [trial court's] findings,' the judgment may not be overturned when the circumstances might also reasonably support a contrary finding. [Citation.] We do not reweigh or reinterpret the evidence; rather, we determine whether there is sufficient evidence to support the inference drawn by the trier of fact." ' " (*People v. Sy, supra*, 223 Cal.App.4th at p. 63.)

## C. *Analysis*

Defendant contends there was no substantial evidence Ehrenreich's claimed loss was the result of defendant's commission of the burglary because it is unclear how the missing tools disappeared. We disagree because the prosecution proved by a preponderance of the evidence defendant was responsible for the loss of these tools.

Defendant and Bulcke were apprehended on Thomas Passalacqua's property where Ehrenreich rented the barn to use as a workshop. Items had been moved both from

7

the house and Ehrenreich's workshop to the garage. Additionally, items within the workshop had been moved from one place to another, and a bottle of wine had been moved from the workshop to defendant's truck. Only two days before the incident, Ehrenreich had been at his workshop where he saw no signs of a forced entry or anything amiss. Further, his workshop had never been previously burglarized.

These circumstances raise the legitimate inference defendant took the missing tools from the workshop which had already been transported away from the property by the time of Jason's arrival, and defendant was in fact preparing to transport other items. The evidence also showed only one break-in; no evidence was introduced of an earlier burglary of the workshop. That the missing tools were not discovered during a probation search of defendant's residence, does not necessarily undermine the reasonable inference the tools were lost as a result of defendant's criminal conduct.

Because substantial evidence supports the trial court's finding by a preponderance of the evidence defendant was responsible for the theft of Ehrenreich's tools, the trial court did not abuse its discretion in awarding restitution in the amount of $5,125.[4]

### III. DISPOSITION

The restitution order is affirmed.

---

[4] Because defendant does not contest the amount of restitution awarded, it is unnecessary to address this issue.

_____

Margulies, J.

We concur:

_____

Humes, P.J.

_____

Banke, J.