Filed 10/7/14  P. v. Lentino CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>VANESSA K. LENTINO,<br><br>　　　Defendant and Appellant. | A138719<br><br>(Solano County<br>Super. Ct. No. FCR288561) |

## INTRODUCTION

Defendant Vanessa Lentino appeals from the sentence and restitution order imposed by the court.  She pled no contest to grand theft by embezzlement of more than $100,000 from her employer.  Defendant argues the court imposed the upper-term sentence of three years on the basis of improper aggravating circumstances, and that the amount of restitution ordered by the court is excessive.  We find the trial court neither relied on improper aggravating circumstances nor abused its discretion in setting the amount of restitution and affirm.

## STATEMENT OF THE CASE

On August 21, 2012, the Solano County District Attorney filed an information that charged defendant with grand theft by embezzlement and further alleged an enhancement for taking property valued over $65,000.  (Pen. Code, §§ 487, subd. (a), 12022.6, subd.

1

(a).)[1]  On December 20, 2012, defendant pled no contest to grand theft and admitted the enhancement.

A combined sentence and restitution hearing commenced on March 5 and ended on March 6, 2013.  The sentencing and further restitution hearing took place on March 28, 2013.  On that date, the court granted a defense motion to continue the restitution hearing but declined to continue judgment and sentence.  The court denied probation and imposed a four-year county jail sentence based on the aggravated three-year term for grand theft and one year for the enhancement.  (§ 1170, subds. (h)(1), (2).)  The concluding two years of defendant's sentence were suspended to allow mandatory supervision.  The trial court entered a preliminary victim restitution order of $132,307.49.  The court set a further restitution hearing allowing additional evidence or briefing on the disputed amounts for April 29, 2013.

On that day, the parties submitted the matter to the court without presenting further evidence or briefs.  The court indicated it would issue its ruling within 90 days.  On July 23, 2013, the court issued a written order modifying the initial amount of restitution ($132,307.49) with a final amount of $200,391.63.  The court ordered the abstract of judgment to be amended accordingly, served on the parties, and made part of the record on appeal.

Defendant's notice of appeal from the judgment and sentence was filed April 23, 2013.

## STATEMENT OF FACTS[2]

Defendant worked as a bookkeeper for Dr. Prigmore's dental practice from October 10, 2009 until July 25, 2011.  Dr. Prigmore's son Matthew succeeded her as

---

[1]  All further unspecified statutory references are to the Penal Code.
[2]  Since defendant resolved the charges by plea, the statement of facts is drawn from the presentence report, which was in turn based on the police report.  The evidence adduced at the restitution hearing is summarized in the discussion of defendant's restitution claims.

bookkeeper and soon discovered defendant had forged business checks to herself totaling $36,515.30. He contacted the police, who travelled to Dr. Prigmore's dentist office in Fairfield on August 2, 2011.

Matthew told the police that on July 25, 2011, the West America Bank branch in Fairfield contacted the dentist office to inquire about an irregular check. Defendant attempted to impersonate the dentist's wife, but she could not provide the bank with the business account password. Dr. Prigmore inspected the check and confirmed he did not authorize defendant to use his signature stamp on any checks. All checks were to be personally signed by Dr. or Mrs. Prigmore.

Matthew located 16 checks totaling $14,046.26 drawn on a West America Bank account that were made out to defendant using two signature stamps. Matthew located another 22 forged checks totaling $20,869.04 drawn on the dentistry's Bank of the West account. In addition, on July 5, 2011, defendant cashed a check for $1,600 drawn on a personal business account using the same forged signature. After defendant was confronted about the thefts on July 25, she failed to show up for work or respond to telephone calls. On July 27, 2011, Dr. Prigmore contacted defendant's husband, who told him defendant admitted the thefts and would meet with him to go over the forged checks and devise a plan for paying back all the money that was owed. After that conversation, there was no more contact between Dr. Prigmore and defendant or her husband.

In August, Dr. Prigmore hired a private consultant to investigate the scope of defendant's fraudulent behavior. The consultant discovered defendant had (1) taken cash from deposits made for the dentist office in Vallejo; (2) made online transfers without approval into her personal accounts; and (3) made purchases and paid personal bills using Dr. Prigmore's credit cards. Matthew provided a written statement to police which included additional losses of $15,275 from Dr. Prigmore's savings account and charges of $20,251.22, $8,956.67, and $34,411.69 from three separate credit cards. In addition, defendant made purchases on a Dell credit account for the Vallejo office, and

3

merchandise worth $4,506.66 was delivered to her home. Based on this review, the total loss was $119,916.54.

Police obtained a search warrant for defendant's home where they found a photo printer, laptop carry case, Dell laptop, zoom pocket video camcorder, a 73-inch HDTV, and a surround-sound system that had been purchased on the Dell line of credit.

## DISCUSSION

### I. Notice of Appeal

At the outset, we address the Attorney General's contention that defendant's restitution claim must be dismissed because she did not file a notice of appeal from the final restitution order. Defendant filed a timely notice of appeal from the judgment of March 28, 2013 which included the preliminary restitution order of $132,307.49. The court had not issued the final restitution order of $200,391.63 until July 23, 2013, nearly four months after judgment. The final restitution order is separately appealable as an order after judgment. (§ 1237, subd. (b); *People v. Guardado* (1995) 40 Cal.App.4th 757, 763 (*Guardado*).) The question here is whether it had to be separately appealed. On these facts, we think the answer is no.

In *Guardado, supra,* the trial court ordered victim restitution but did not specify any amount. (40 Cal.App.4th 757, 762.) The court of appeal held such an order is unenforceable, but observed it was not "void" so long as the trial court reserves jurisdiction on the amount and then enters an enforceable order specifying the amount of restitution. (*Id*. at pp. 762-763.) The *Guardado* court also observed that such an order is separately appealable. (*Id.* at p. 763.) However, since no such subsequent order was made, the timeliness of the defendant's notice of appeal from the sentence and judgment was never an issue in *Guardado*.

Defendant asks us to exercise our discretion to treat her notice of appeal as embracing the court's final disposition of previously litigated issues by deeming her notice of appeal from the judgment premature with regards to the restitution order. In

*People v. Denham* (2014) 222 Cal.App.4th 1210, the court of appeal rejected a similar argument and declined to entertain an appeal from a restitution order issued several months after judgment was entered and a timely notice of appeal therefrom was filed. (*Id.* at p. 1213.)  In that case, when the court pronounced judgment, it reserved the issue of victim restitution, stating:  " 'The Court *will set* a restitution hearing in this matter here shortly and we'll deal with that issue.'  Defense counsel inquired whether the time to file the notice of appeal ran from that day, and the court advised defendant to file his notice of appeal immediately as 'restitution is kind of a separate issue.' " (*Ibid*, italics added.) Defendant filed a notice of appeal 21 days after judgment. (*Ibid*.)  The court commenced the restitution hearing almost six months later and ordered victim restitution;  the defendant did not appeal that order. (*Ibid*.)  The *Denham* court concluded:  "[T]he notice of appeal from the judgment should not be treated as a premature notice of the later victim restitution order.  'A notice of appeal is premature if filed before the judgment is rendered or the order is made, but the reviewing court may treat the notice as filed immediately after the rendition of judgment or the making of the order.' (Cal. Rules of Court, rule 8.406(d).)  Defendant's notice of appeal was from the judgment and, therefore, it would be inconsistent to also treat it as a premature notice of appeal from the victim restitution order." (*Id.* at p. 1214.)

In our view, *Denham* is factually distinguishable and not dispositive here. Defendant Lentino's  pleas to the substantive charge and enhancement contemplated a restitution hearing would be part and parcel of sentencing.  The only contested issue was victim restitution, which was litigated extensively over two days and included witness testimony.  As of March 28, 2013, the date set for sentencing, the court had resolved some but not all of the restitution issues and entered a preliminary order of $132,307.49.

Prior to March 28, the date previously set for the restitution order and sentencing, defendant asked for a continuance to review and address 130 pages of documents relating to the restitution claim which had been delivered to her counsel since the last hearing.

5

The court opted to proceed with sentencing and issued an interim restitution order of $132,307.49 "that would be subject to amendment or modification down the road depending upon what additional information I receive."[3] Thus, the court and all parties understood this was not a final order, and that the court retained jurisdiction to determine the full amount of restitution.

Under these circumstances, it appears inappropriate to dismiss defendant's restitution claim for failure to file a second notice of appeal. As observed in *In re Ricky H.* (1992) 10 Cal.App.4th 552, an appellate court has the discretion to treat a notice of appeal filed before a final order as timely. (*Id.* at pp. 558-559.) "Typically, premature appeals are deemed to be timely when the decision being appealed from has been made preliminarily, but is not yet final. For instance, premature notices of appeal have been treated as timely when they were filed after the verdict but before the pronouncement of judgment [citation], or after a judge announced an intended decision but before a final judgment was signed [citation]." (*Id.* at p. 558.) In our view, this case is similar. Therefore, we will exercise our discretion to review defendant's challenges to the court's final order.

## II. Restitution Issues

Dr. Prigmore requested $251,606.57 in restitution for economic losses suffered as a result of defendant's embezzlement from his two dental offices in Fairfield and Vallejo. His claim was supported by an itemized list of 17 categories of losses he provided the probation department. After two days of testimony from a forensic accountant and a bookkeeper hired by Dr. Prigmore, as well as a defense expert, the court awarded Dr. Prigmore $200,391.63 in restitution, a reduction of Dr. Prigmore's claim by $51,214.94.

---

[3] That sum expressly included full reimbursement for the work performed by Matthew Prigmore and Ms. Bilicich. The court subsequently reconsidered and reduced its reimbursement for the work done by Mathew Prigmore, among other issues, as discussed in its amended restitution order. The court also directed the abstract of judgment to be amended to reflect the new amount.

6

Defendant challenges the award of (1) $7,906.45 misappropriated from cash fees patients paid at the Vallejo office; (2) $14,575.00 for fees paid by Dr. Prigmore to forensic accountant Daphne Bilicich to investigate his losses from the embezzlement; and (3) $11,051.91 of the $14,735.88 Dr. Prigmore paid his bookkeeper to assists the accountant in the investigation.

In California, a crime victim has a constitutional right to restitution from the defendant who causes the victim's loss. (Cal. Const., art. I, § 28, subd. (b)(13).) Implementing that right, section 1202.4, subdivision (f) requires the sentencing court to order restitution for economic losses caused by the defendant, "based on the amount of loss claimed by the victim . . . or any other showing to the court," in an amount sufficient to fully reimburse the victim "for every determined economic loss incurred as the result of the defendant's criminal conduct." (§ 1202.4, subds. (f), (f)(3).) Economic losses include "[a]ctual and reasonable attorney's fees and other costs of collection accrued by a private entity on behalf of the victim." (§ 1202.4, subd. (f)(3)(H).)

"[T]he party seeking restitution [must] provide an adequate factual basis for the claim." (*People v. Giordano* (2007) 42 Cal.4th 644, 664.) The burden of proof here is by a preponderance of the evidence. (*People v. Sy* (2014) 223 Cal.App.4th 44, 63.) Once a prima facie case for restitution is made out, the burden shifts to the defendant to rebut the showing. (*People v. Sy, supra*, 223 Cal.App.4th at p. 64; see also *People v. Tabb* (2009) 170 Cal.App.4th 1142, 1154.)

We review the trial court's restitution award for abuse of discretion. (*People v. Giordano, supra*, 42 Cal.4th at p. 663.) " '[T]he court's discretion in setting the amount of restitution is broad, and it may use any rational method of fixing the amount of restitution as long as it is reasonably calculated to make the victim whole. [Citations.]' " (*People v. Millard* (2009) 175 Cal.App.4th 7, 26.) We review the court's factual findings for substantial evidence. " ' "We do not reweigh or reinterpret the evidence; rather, we determine whether there is sufficient evidence to support the

7

inference drawn by the trier of fact. [Citation.]" [Citation.]' " (*People v. Sy, supra*, 223 Cal.App.4th at p. 63.) With these principles in mind, we turn to defendant's claims.

### A. Patient Fees

The trial court found that defendant failed to controvert the victim's restitution claim with respect to the $7,906.45 in patient fees from the Vallejo office that were missing. The court further found that the testimony at the hearings, the defendant's statements to probation, and the other information contained in the presentence report provided support for this and other claims. Defendant argues she did not have to controvert the claim because the prosecution did not make a prima facie showing that the missing cash was attributable to defendant's criminal conduct. She argues the testimony showed she "did not receive cash payments, she did not prepare deposit slips, she did not enter cash receipts into the system and she did not make bank deposits for the Vallejo office." We disagree.

Ms. Bilicich, the forensic accountant, testified some patients in the Vallejo office paid in cash. The receptionist at the front desk entered the cash amounts in a program called Dentrix that tracked daily patient sheets. The receptionist would receive the money and give the patient a receipt. Typically, the receptionist prepared the deposit slips and balanced them in the Dentrix program. A receipt would be generated to the patient and another receipt would be kept at the office. At some point, the cash would be deposited in the bank account and a deposit slip or some other record reflected that cash deposit. Bilicich compared the receipts for cash and the bank deposit records. The deposit tickets had been rewritten; copies of the deposit tickets remained with the original deposit in the Fairfield branch. Bilicich discovered a discrepancy of $7,906.45 between patient receipts and bank deposit tickets. She also learned it was not defendant's responsibility to make those deposits; it was the Vallejo office manager's responsibility. However, the doctored deposits were made at the Fairfield branch of the bank rather than the Vallejo branch.

8

Matthew Prigmore, Dr. Prigmore's bookkeeper, testified he learned from defendant's timesheets, mileage reimbursement sheets, and interviews with the office managers of both the Fairfield and Vallejo offices that defendant regularly worked six hours in Vallejo and twelve hours in Fairfield every week. She would travel between Fairfield and Vallejo two to three times a week.

To the extent this evidence of opportunity failed to establish a connection between defendant and the doctored bank deposits, defendant's own admission to probation she went to the bank provided the missing link. She said she worked 26 hours a week, Monday through Wednesday from 9:00 a.m. to 4:00 p.m. and Fridays from 8:30 a.m. to 1:30 p.m. She also worked occasionally on Thursdays and "always had to run errands before [she] went home. Cleaners, *bank*, *back to* the Fairfield office [and] any other thing Dr. Prigmore requested." (Italics added.) From this evidence the trial court could infer that on some of her roundtrips, defendant deposited monies from the Vallejo office at the Fairfield bank. Furthermore, *no* evidence suggested there was another suspect among Dr. Prigmore's employees. These other employees had each been with the dentist for 32, 27, 13, 12 and eight years. Substantial evidence supports the court's finding that defendant kept $7,906.45 in cash from Dr. Prigmore's Vallejo office.

### B. Investigative Costs

Defendant concedes that some "[s]elf-help expenses, such as investigation, are recoverable, " but asserts Dr. Prigmore's investigative expenses are not recoverable because his justification for using a forensic accountant and bookkeeper to ferret out the full extent of his losses was based on a lack of confidence in the police department's investigation service. Defendant cites no authority for the proposition that a victim's reasons for expending funds on investigation of the crime disqualifies his recovery of investigative costs. Section 1202.4 does not permit a public law enforcement agency to recover its investigative costs, because " 'public agencies are not directly "victimized" for purposes of restitution under Penal Code section 1202.4 merely because they spend

9

money to investigate crimes or apprehend criminals.' " (*Luis M. v. Superior Court* (2014) 59 Cal.4th 300, 305, quoting *People v. Ozkan* (2004) 124 Cal.App.4th 1072, 1077.)  On the other hand, the statute does permit a direct victim to "recover out-of-pocket expenses for assisting with the investigation and prosecution of the victim's case as these 'expenses clearly constitute "economic loss incurred as the result of the defendant's criminal conduct . . ."' (*People v. Ortiz* (1997) 53 Cal.App.4th 791, 797-798; see also *People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1182-1183 & fn. 9; *People v. Maheshwari* (2003) 107 Cal.App.4th 1406, 1409, 1411)." (*People v. Sy, supra*, 223 Cal.App.4th at p. 64.)

In *People v. Sy*, the victim hired a private investigator who specialized in infringement investigations to attend a trade show and pose as a buyer of the defendants' counterfeit goods. (223 Cal.App.4th 44, 51-52.)  The results of the investigation were turned over to law enforcement officers who, "[w]ith assistance from the investigative company's employees, . . . seized over 13,000 counterfeit items." (*Id*. at p. 52.)  The trial court ordered restitution for the victims' investigation costs, and the court of appeal affirmed.  (*Id*. at pp. 62, 65.)  Defendant does not cite *People v. Sy,* and we discern no basis for distinguishing it from this case.  The trial court did not abuse its discretion in ordering defendant to reimburse Dr. Prigmore for his investigative costs.

Next, defendant argues the fees paid to the forensic accountant and the bookkeeper were grossly excessive.  Ms. Bilicich was paid $100 per hour for about 145 hours – or approximately three and one-half weeks – of work.  Defendant argues her hourly rate should be cut, but she did not advance that argument below or present any evidence to suggest that $100 per hour is an excessive hourly rate for a forensic accountant with Bilicich's experience and credentials.

Alternatively,  defendant argues the entire claim for Ms. Bilicich's work should be cut because the court "never actually explained what Bilicich's expert review added to Matthew's 'legwork' to overcome its initial skepticism at the hearing that she was just a

10

conduit for hearsay." [4]  The court found "the victim's employment of and payment to witness Bilicich to conduct a forensic account examination of his business records in order to help determine the nature and extent of the losses caused by defendant's criminal conduct was reasonable and necessary under the circumstances (losses sustained over a substantial period of time by multiple means, and at different locations)."  This finding is amply supported by the record.

According to the presentence report, when Matthew first contacted the police on August 2, 2011, he had uncovered losses of $36,515.30 due to checks defendant had forged and cashed.  As a result of hiring Bilicich to conduct further investigation into the scope of defendant's fraudulent behavior, Dr. Prigmore discovered that from October 2009 (the date defendant was hired) until July 2011 (the date of termination), defendant embezzled more than $119,000 by various means, including taking cash from the Vallejo office, making online transfers, using Dr. Prigmore's credit cards, and making purchases on a Dell credit account and having the merchandise delivered to her home.  The results of her investigation were provided to the police, who secured a search warrant to search defendant's house and recovered some of the merchandise she had purchased through Dell, and to the district attorney's office for prosecution.

By the time she and Matthew concluded the investigation, an additional $100,000 worth of economic losses had been discovered.  As a result of Ms. Bilicich's audits, total losses of $251,606.57 were documented and provided to the probation department in January 2013.  Ms. Bilicich testified at the hearing about how she uncovered and

---

[4]  In fact, the court did not express the view that Ms. Bilicich was "just a conduit for hearsay."  The court expressed frustration with the prosecutor's questions to her about where the equipment ordered from Dell was delivered, since she had already testified Matthew Prigmore had contacted Dell.  The court stated: "She can base her opinion on hearsay, even double hearsay, but just to have her as a conduit to recite double hearsay."  The prosecutor rephrased his question and eventually got his answer.

11

documented the losses. The evidentiary record before the trial court provides substantial evidence to support its finding and order with respect to Ms. Bilicich.

With respect to Matthew Prigmore's services, the court reduced the award by 25 percent, or $3,683.97, because "[t]here was some duplication of effort between Matthew Prigmore and Ms. Bilicich . . . [but] it would be unduly time consuming and burdensome to conduct further hearings to determine the extent of that duplication." However, the court evidently credited Matthew's and Bilicich's testimony about the amount of work Matthew performed and the time it took him to do it. The court found: "It is clear that Matthew Prigmore did an extensive amount of legwork (records review, telephone calls, etc.) independently of Ms. Bilicich's efforts . . . in ascertaining the nature and extent of the loss caused by the defendant's criminal conduct."

The record supports the trial court's findings. In response to the court's questioning, Matthew testified he was paid $24.50 per hour for his work "to try to get to the bottom of the restitution." Without looking at his timecards, he was not able to say how many hours he "worked on this case, as opposed to any other work [he] did." Ms. Bilicich had computed the $14,735.88 figure for his pay, and he was not "privy to these numbers" and did not "know how they were derived." However, he knew the bookkeeping job took 25 to 30 hours per week, and he would "spend extra time on top of that" working on the investigation. Matthew began working as his father's bookkeeper "the week previous to Ms. Lentino stopping work," in July 2011. On July 25, 2011, the Fairfield branch of the West America Bank called the dentist office to inquire about irregular signatures on checks, the event which triggered the investigation of defendant's malfeasance.

Defendant embezzled from Dr. Prigmore's offices for 21 months, from October 2009 to July 2011. In the two and one-half years from July 2011 until January 2013, when Dr. Prigmore submitted to the probation officer an itemized list of $251,606.57 in losses he attributed to defendant's conduct, Matthew had expended 601 hours, or roughly

12

20 hours per week, investigating and documenting defendant's embezzlement schemes. In addition to contacting banks about cancelled checks, deposits, and deposit slips, he contacted credit card issuers about statements. Matthew went over every billing charge on every credit card statement with his father. He investigated most of the fraudulent credit card charges himself, totaled them, and made a spreadsheet. His efforts also included hunting down and checking defendant's timecards and paychecks, calculating discrepancies between the payroll actually paid to defendant and payroll receipts, comparing his calculations with Bilicich's, putting together documents for Bilicich's review, manually entering items into and making calculations on spreadsheets, bringing matters he found questionable to Bilicich's attention, reviewing check signatures for forgeries, accessing the QuickBooks program and talking to Dr. Prigmore, and identifying personal charges on credit cards for Bilicich. He also contacted Dell about charges and tracked deliveries to defendant's home. The defense did not introduce any evidence showing that Matthew did not do what he said he did, or was paid a different amount than he said he was paid, or worked fewer than 601 hours. In our view, substantial evidence supports the court's reduced award of $11,051.91. No abuse of discretion appears.

### C. Mathematical Error

The parties ask us to correct a mathematical error. The court reduced the restitution award by "the sum of $9,327.69" for double-counting that occurred when defendant used one or more forged checks to pay her fraudulent credit card charges, and for telephone charges to an 800 number that could not be attributed to her. The sum should have been $9,328.30 ($6,175.69 [forged checks] plus $3,152.61[telephone charges] totals $9,328.30). Therefore, this court will order the reduction of the restitution award by 61 cents.

13

**III. Issues Related to the Imposition of the Aggravated Term**

Defendant argues the imposition of the aggravated term in this case violated proscriptions against (1) using the fact of any enhancement to aggravate and enhance the sentence, and (2) using an element of the crime to impose the aggravated term. (§ 1170, subd. (b); Cal. Rules of Court, rule 4.420, subds. (c) & (d).) We disagree. Preliminarily, the People argue defendant has waived her appellate challenges to the aggravated term because she did not object below on these grounds. We reject this argument as well.

The presentence report identified two circumstances in aggravation: (1) the crime involved planning and sophistication, and (2) defendant took advantage of a position of trust and confidence. The presentence report also identified two circumstances in mitigation: (1) defendant's lack of a prior record, and (2) a gambling addiction, and recommended probation. During the sentencing hearing, the prosecutor argued against probation and for imposition of the aggravated term and the enhancement "based upon the overwhelming preponderance of aggravating factors." Defense counsel argued for probation and against a prison sentence, stating: "[G]iven the mitigating circumstances, given . . . Ms. Lentino's lack of criminal history, I don't believe that this crime was carried out any differently than any other crime of similar circumstances. I don't know that there was a – I mean, there was some sophistication, but, again, that's what embezzlement is, you violate the trust. That is the way these crimes are committed."

The court denied probation and imposed the aggravated term and the enhancement, stating: "*I'm denying probation because* of the nature, the seriousness and the very means by which this crime was committed by her compared to others and the length of time that was involved. This is far and above the most – as embezzlement cases go, this is a serious one. It's not a minor one. Also, the degree of loss to the victim turned out to be more than twice the 12022.6 enhancement that was pled and proven. She was an active participant, and her actions had a substantial impact on this business and the people who worked there. [¶] *I've selected the high term because* she violated a

14

position of trust over and over and over again, and the crime was carried out with a degree of planning and sophistication on multiple fronts. So those are the reasons for my sentencing decision." (Italics added.)

## A. *Waiver*

The Attorney General argues defendant has forfeited her appellate challenge to the court's reasons for imposing the aggravated term because she did not object below. We disagree. In *People v. Scott* (1994) 9 Cal.4th 331 (*Scott*), our Supreme Court adopted a waiver doctrine with respect to "claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices. Included in this category are cases in which the stated reasons allegedly do not apply to the particular case, and cases in which the court purportedly erred because it double-counted a particular sentencing factor, misweighed the various factors, or failed to state any reasons or give a sufficient number of valid reasons." (*Id.* at p. 353.) Here, the presentence report listed the factors in aggravation. Counsel argued the reasons why the court should not rely on them. The court relied on them anyway. Under these circumstances, the defendant's argument fully apprised the court of her reasons for objecting to a jail sentence. Lodging an objection restating the same grounds after the fact would have been futile and would have served no purpose. Addressing this concern, our Supreme Court observed: "Of course, there must be a meaningful opportunity to object to the kinds of claims otherwise deemed waived by today's decision. This opportunity can occur only if, during the course of the sentencing hearing itself and before objections are made, the parties are clearly apprised of the sentence the court intends to impose and the reasons that support any discretionary choices." (*Id.* at p. 356.) The court here did not afford defendant the kind of opportunity to object envisioned by the *Scott* decision. Accordingly, we conclude defendant's sentencing arguments are not waived.

15

### B. Dual Use of Enhancement Facts

Defendant argues the court improperly used the fact of the section 12022.6 enhancement – taking property worth more than $65,000 – to aggravate and enhance the sentence. "[T]he court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law." (§ 1170, subd. (b).) "[A] fact charged and found as an enhancement may be used as a reason for imposing the upper term only if the court has discretion to strike the punishment for the enhancement and does so." (Cal. Rules of Court, rule 4.420(c).) However, the court did not use the fact of the enhancement (i.e., the amount of the loss) as a reason to impose the aggravated term. The court cited the amount of the loss as a reason for denying probation, which is allowed. (*Scott, supra*, 9 Cal.4th at p. 350, fn. 12.) In our view, the court's reliance on defendant's repeated violations of a position of trust, evidenced by a high degree of planning and sophistication on multiple fronts, did not reference the dollar amount of the taking. Defendant's argument fails.

### C. Dual Use of An Element of the Offense

Defendant also argues the court improperly relied on an element of the offense to impose the aggravated term. A sentencing judge is prohibited from using "[a] fact that is an element of the crime . . . to impose a greater term." (Cal. Rules of Court, rule 4.420(d).) "A sentencing factor is an element of the offense if the crime as defined by statute cannot be accomplished without the performance of the acts which constitute such factor." (*People v. Clark* (1992) 12 Cal.App.4th 663, 666.) "Embezzlement is the fraudulent appropriation of property by a person to whom it has been intrusted." (§ 503.) The essence of embezzlement is the fraudulent use or conversion of property entrusted to the defendant by another. (*People v. Talbot* (1934) 220 Cal. 3, 15.) Thus, violation of a position of trust is an element of embezzlement, and the court may not rely on it to aggravate a sentence. (*Ibid.*)

16

However, in this case, the court did not rely on the bare fact that defendant violated a position of trust; it relied on the fact that she did so "over and over and over again, and the crime was carried out with a degree of planning and sophistication on multiple fronts." Planning and sophistication are not statutory elements of embezzlement, inasmuch as that offense can be committed without much of either. Moreover, "[t]he essence of 'aggravation' relates to the effect of a particular fact in making the offense distinctively worse than the ordinary." (*People v. Moreno* (1982) 128 Cal.App.3d 103, 110.) "[W]here the facts surrounding the charged offense exceed the minimum necessary to establish the elements of the crime, the trial court can use such evidence to aggravate the sentence. [Citation.] Stated another way, rule 420(d) [now rule 4.420(d)] does not preclude a court from using facts to aggravate a sentence when those facts establish elements not required for the underlying crime." (*People v. Castorena* (1996) 51 Cal.App.4th 558, 562, italics omitted.) That is the case here. To prove embezzlement, it was not required to show that defendant repeatedly stole from Dr. Prigmore or used so many different ways to accomplish the thefts.

In any event, assuming arguendo the court erred in relying on defendant's abuse of a position of trust, the error was nevertheless harmless. (*People v. Osband* (1996) 13 Cal.4th 622, 728-729.) The court's reliance on planning and sophistication was proper, given the many different ways in which defendant inventively converted Dr. Prigmore's property to her own use over 21 months. Moreover, the court stated among the reasons for denying probation that it viewed this case as a very serious example of embezzlement. The error does not require a remand for resentencing. (*People v. Osband, supra*, 13 Cal.4th at p. 729.)

## DISPOSITION

The order awarding restitution of $200,391.63 is reduced by 61 cents to $200,391.02. As modified, the judgment is affirmed.

17

_____
Dondero, J.

We concur:


_____
Humes, P.J.


_____
Banke, J.