[No. A103438. First Dist., Div. Five. Dec. 9, 2004.]

THE PEOPLE, Plaintiff and Appellant, v.
SEZER OZKAN, Defendant and Respondent.

## COUNSEL

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Laurence K. Sullivan and Catherine A. Rivlin, Deputy Attorneys General, for Plaintiff and Appellant.

Laureen A. Bethards, under appointment by the Court of Appeal for Defendant and Respondent.

## OPINION

**STEVENS, J.**—Sezer Ozkan (Ozkan) was convicted of two felonies, grand theft by fraud (Pen. Code, § 484, subd. (a)) and filing false and fraudulent sales and use tax returns (Rev. & Tax. Code, § 7153.5), on a negotiated plea of guilty. The trial court placed Ozkan on probation, and imposed a condition

of restitution as to certain damages suffered by direct victims, but the court declined to order restitution for investigative costs to government agencies that had investigated the crimes.

The People appeal, contending the trial court should have ordered full restitution of the public agencies' losses, including investigative costs, which were incurred as a result of Ozkan's criminal conduct. We agree, and reverse the trial court's order.

## I. *FACTUAL AND PROCEDURAL HISTORY*

The criminal charges in issue arose out of a scheme by Ozkan to sell regular gasoline as higher priced mid-grade and premium gasoline. In addition to bilking the public, Ozkan's business also failed to remit to the State Board of Equalization (SBE) the full amount of the sales taxes collected on gasoline sold at his stations. The direct victims of these acts included the defrauded members of the public who had purchased regular gasoline at premium prices. Other victims included the SBE, to which taxes were due, as well as the Division of Measurement Standards (DMS), which enforces and certifies the quality, advertising, and labeling standards for petroleum products.

Ozkan entered a negotiated plea of guilty to charges alleging grand theft (count one) and filing false sales tax returns (count four). (Pen. Code, § 484, subd. (a); Rev. & Tax. Code, § 7153.5.) Counts charging conspiracy to obtain money by false pretenses (count two), and conspiracy to defraud by use of false advertising (count three), were dismissed subject to *Harvey* waivers,[1] which allowed the court to consider the dismissed counts for purposes of sentencing and restitution. (Bus. & Prof. Code, §§ 12026, 13413, subds. (a)–(d), 13501, 13595, 17500; Pen. Code, § 182, subd. (a)(1).)

The counts that were dismissed, but could be considered by the trial court under the *Harvey* waiver, contained allegations that Ozkan committed various illegal acts by unlawfully selling and advertising gasoline in violation of the laws regarding accurate weights and measures as set forth in the Business and Profession Code. For example, the amended complaint charged that Ozkan and his codefendants sold gasoline as "Unleaded Plus" or "Super Unleaded" on specified dates in January and February of 1998, even though this gasoline did not have the octane rating necessary for such advertising and sales in violation of Business and Professions Code sections 13413 and 13501. Ozkan acknowledged that a consequence of his guilty plea would be the payment of restitution to "any victims that there may be in this case" as a condition of his probation.

---

[1] See *People v. Harvey* (1979) 25 Cal.3d 754 [159 Cal.Rptr. 696, 602 P.2d 396] (*Harvey*).

The following recited facts formed the factual basis of Ozkan's plea: "Mr. Ozkan is the president of CSN Oil Corporation which owned a series of gas stations called IGS, standing for Independent Gas Station. [¶] Mr. Ozkan during the progress of that business, and as its president, learned of the fact that regular gasoline was being placed in the supreme and mid-grade tanks. In fact, one of the drivers who was asked to place more of the incorrect gasoline into that tank than he thought appropriate personally confronted Mr. Ozkan regarding that matter. [¶] Mr. Ozkan, as the president, was also responsible for signing the sales tax returns, and Robert Ferraro, who is a[n] auditor with the Board of Equalization, conducted an audit of the sales tax returns, the sales information taken from the CSN Oil offices from a search warrant, and the actual delivery invoices provided by the suppliers, and he calculated that the way the sales were manipulated so as to explain the supreme versus regular versus mid-grade and make those all come out, that approximately $27,000 in sales tax which was collected was not paid to the State of California and was not declared on the tax forms."

At sentencing, Ozkan requested a hearing as to the issue of whether direct victim restitution would include investigative expenses. The court suspended imposition of sentence, placed Ozkan on probation for five years, ordered the payment of restitution to victims as to all counts, and scheduled a restitution hearing to ascertain the amounts to be paid.

The first restitution hearing took place on March 13, 2003. This was followed by the court's written order, dated March 24, 2003, which imposed restitution to the victim agencies, SBE and DMS, for the unpaid taxes, penalties, and interest. Pursuant to Business and Professions Code section 12015.5, the court also ordered restitution for investigative costs, based on the public agencies' investigation of the nature and extent of Ozkan's criminal conduct. However, on defense motion, the court reopened the question of restitution and set a further hearing that took place on June 26, 2003. The ultimate result of that hearing was the issuance of a supplemental order which reduced restitution by over $200,000, by excluding reimbursement for the agencies' investigative costs. The People's appeal addresses only the court's reduction of the restitution order relative to the claimed investigative costs.

## II. *DISCUSSION*

In determining whether it was error to deny restitution to the public agencies for their investigative costs, we are mindful that the trial court's ruling "must be sustained unless it constitutes an abuse of discretion or rests upon a demonstrable error of law." (*In re S.S.* (1995) 37 Cal.App.4th 543, 550 [43 Cal.Rptr.2d 768]; accord, *People v. Draut* (1999) 73 Cal.App.4th 577, 581–582 [86 Cal.Rptr.2d 469] (*Draut*).)

We first consider whether such investigative costs were recoverable under the general restitution statute, Penal Code section 1202.4, which was cited as controlling by the trial court in its ruling. We then consider whether these costs are recoverable as restitution under another more limited statute, Business and Profession Code section 12015.5, which had been cited by the trial court in its original ruling which tentatively allowed such a recovery.

### A. INVESTIGATIVE COSTS ARE NOT GENERALLY RECOVERABLE AS RESTITUTION UNDER PENAL CODE SECTION 1202.4.

The general restitution statute, Penal Code section 1202.4, subdivision (a)(1), provides that "a victim of crime who incurs any economic loss as a result of the commission of a crime shall receive restitution directly from any defendant convicted of that crime." The definition of a "victim" in Penal Code Section 1202.4, subdivision (k)(2), includes a governmental agency "when that entity is a *direct victim* of a crime." (Italics added.)

In *People v. Torres* (1997) 59 Cal.App.4th 1 [68 Cal.Rptr.2d 644] (*Torres*), Division Four of this court considered the question of whether an investigating public agency was a "direct victim" under the general restitution statute. There, sheriff's deputies investigating illegal drug trafficking had used county funds to buy illegal drugs from the defendant, and the prosecution sought the recovery of those sums in the form of restitution. Interpreting the 1995 statutory scheme (Former Pen. Code, § 1202.4, subd. (p), added by Stats. 1994, ch. 1106, § 3, p. 6548), *Torres* held that restitution was unauthorized under these circumstances. The court reasoned that the public did not suffer loss as "direct victim[s]" of crime by spending money for drug purchases in the course of investigating criminal activity. (*Torres, supra,* at pp. 4–5.) In the words of the court, "The sheriff's deputies bought and apparently received what they paid . . . for, methamphetamine." (*Id.* at p. 3.)

This analysis is consistent with that in *People v. Birkett* (1999) 21 Cal.4th 226 [87 Cal.Rptr.2d 205, 980 P.2d 912] (*Birkett*), where the high court concluded that an insurance company is not a "direct victim" under the 1994 statutory scheme. In *Birkett*, defendants were convicted of illegal activities connected to the operation of a "chop shop," i.e., a facility used for the illegal trade in stolen cars. The trial court ordered restitution to the direct victims of the auto thefts, as well as to two insurance companies that had indemnified certain insureds for their stolen vehicles. (*Id.* at pp. 229–230.) After a lengthy analysis of the statute and its Proposition 8 origin, the court observed: "[n]othing in the language or history of the initiative measure compels the conclusion that persons other than the real, actual, immediate, and direct

victims of crime have a constitutional right to restitution from the offenders." (*Id.* at p. 243.)[2]

Appellate cases that follow *Torres* also recognize the recovery of restitution only for losses directly "resulting from unusual expenses directly incurred because of defendant's conduct." (*People v. Rugamas* (2001) 93 Cal.App.4th 518, 523 [113 Cal.Rptr.2d 271] [upholding a restitution award to a police department for medical bills it had paid on behalf of a defendant following his violent arrest].)

Citing Penal Code section 1202.4, the People argue that where a public agency acts in a public safety capacity in its investigative role, the costs it incurs may be direct economic losses resulting from defendant's criminal conduct, and thereby subject to restitution. They rely on *People v. Narron* (1987) 192 Cal.App.3d 724, 729, 735–737 [237 Cal.Rptr. 693], which permitted an award of restitution for county cleanup costs related to the defendant's illegal drug lab, where such a cleanup was necessary to secure public safety. However, in the present case, this public safety argument was not properly raised by the prosecution in the trial court, and thus it has been waived for purposes of appeal. (See *People v. Tillman* (2000) 22 Cal.4th 300, 303 [92 Cal.Rptr.2d 741, 992 P.2d 1109].) In any event, the record shows the public agencies in question were impelled by a desire to collect taxes and prevent cheating, not a desire to secure public safety.

■ Under the relevant case law and the statutory scheme, public agencies are not directly "victimized" for purposes of restitution under Penal Code section 1202.4 merely because they spend money to investigate crimes or apprehend criminals. The Legislature is of course free to expand the statutory scheme, or create exceptions for particular crimes, and in the next section of this opinion we examine one such exception.

## B. *INVESTIGATION COSTS WERE RECOVERABLE UNDER BUSINESS AND PROFESSIONS CODE SECTION 12015.5.*

The People contend that even if the investigative costs in issue are not recoverable as restitution under the general restitution statute, Penal Code section 1202.4, those costs are nevertheless recoverable under the more

---

[2] Our Supreme Court left open the question of whether a *government agency* incurring costs as a result of crime is a direct or indirect victim in *People v. Crow* (1993) 6 Cal.4th 952, 958 and footnote 4 [26 Cal.Rptr.2d 1, 864 P.2d 80]. However, when the high court addressed the question of whether insurance companies are direct or indirect victims, it held that the answer depended upon whether obtaining proceeds under the company's contract of insurance had been the object of the crime. (*Birkett, supra,* 21 Cal.4th 226, 232; see also *People v. Moloy* (2000) 84 Cal.App.4th 257, 260–261 [100 Cal.Rptr.2d 676]; *People v. O'Casey* (2001) 88 Cal.App.4th 967, 971 [106 Cal.Rptr.2d 263].) The California Supreme Court has cited *Torres, supra,* 59 Cal.App.4th 1, with apparent approval on this point. (*Birkett, supra,* at pp. 247–248, fn. 21.)

specific mandate of Business and Professions Code section 12015.5.[3] We agree, for the reasons that follow.

   1. *The Plain Language of Section 12015.5 Indicates that Restitution of Investigation Costs "Shall be" Ordered After a Criminal Conviction.*

We begin with the plain wording of section 12015.5: "Any person convicted of violating any of the provisions of this division [relating to weights and measures], or, except as provided in Section 12028, any person who is determined to be civilly liable for violating any of the provisions of this division, *shall be liable for reasonable costs incurred in investigating the action.*" (Italics added.) As pertinent here, this statute authorizes the recovery of investigation costs from a defendant who is convicted of a violation under the relevant division of the Business and Professions Code (division five) relating to weights and measures.

Section 12028 however provides a limited exception: "No investigative costs shall be imposed pursuant to Section 12015.5 for violations for which civil penalties may be imposed pursuant to Section 12015.3." Section 12015.3 in turn allows for the recovery of civil penalties for violations of the relevant division of the Business and Profession Code (division five) relating to weights and measures. We must read these relevant statutory provisions of the Business and Professions Code together, according to their plain meaning, in order to discern the intent of the Legislature. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196] (*Day*).)

At first glance, it might not appear that Ozkan would come within the literal meaning of section 12015.5, since he was not "convicted of violating any of the provisions of this division." Under his plea agreement, the two conspiracy counts charging violations of the Business and Professions Code were dismissed. But, as the People point out, appellant's plea agreement included a *Harvey* waiver, which would allow the sentencing court to consider the facts of the dismissed counts in ordering restitution. (See *People v. Moser* (1996) 50 Cal.App.4th 130, 132–133 [57 Cal.Rptr.2d 647]; *People v. Campbell* (1994) 21 Cal.App.4th 825, 830 [26 Cal.Rptr.2d 433]; *People v. Baumann* (1985) 176 Cal.App.3d 67, 75 [222 Cal.Rptr. 32].) One of the dismissed counts, count three, charged overt acts enumerating violations of the Business and Professions Code (division five) related to weights and measures. As these violations fall within section 12015.5, Ozkan's plea agreement brought him within to the provisions of this statute. We next consider whether the statute requires the trial court to order restitution of investigation costs.

---

[3] All subsequent statutory references are to the Business and Professions Code, unless otherwise indicated.

Section 12015.5 states that an order for recovery of investigation costs "shall" be imposed where a defendant is "convicted of violating any of the provisions of this division." The mandatory language of the statute would indicate the trial court was required to order restitution of investigation costs when it applies.

Section 12015.5 does contain a partial exception, section 12028, which precludes the restitution of investigation costs in those instances where only civil penalties "may be" imposed, for violations of division five of the Business and Profession Code, relating to weights and measures. Ozkan attempts to rely on this exception. He suggests the plain language of section 12015.5, and its legislative history, indicate that investigation costs cannot be awarded whenever civil penalties "may" theoretically have been available, even if instead criminal proceedings resulting in a conviction were brought.

■ The present case, of course, is one in which Ozkan was not charged with any civil violations for which civil penalties "may be" imposed, and thus the exception stated in section 12028 does not apply. Rather, Ozkan's plea makes him subject to the mandatory language pertaining to a criminal prosecution and conviction, and section 12015.5 very clearly states that investigative costs "shall" be imposed whenever there is a criminal conviction, as there is here. The provision in section 12028 barring restitution of investigative costs when civil penalties "may" be imposed is simply not relevant to this appeal. Ozkan's reading of section 12015.5 would also be at odds with the plain language of section 12015.5 and 12028, and would render mere surplusage the provision of section 12015.5 explicitly stating that investigative costs "shall be" recovered if there is a criminal conviction, since it would always be theoretically possible that the People could have sought civil penalties instead of a criminal conviction. Applying the plain language of the statute, we conclude that restitution of investigation costs was mandatory in this instance.[4]

> 2. *The Legislative History of Section 12015.5 Also Indicates that Restitution of Investigation Costs "Shall be" Ordered.*

■ Ozkan also claims the legislative history of section 12015.5 favors his argument. Where, as here, the meaning of a statute is clear on its face, we need not consult sources of legislative history to discern the intent of the lawmakers, so as to interpret the statute. (See *Day, supra,* 25 Cal.4th at p. 272.) However, Ozkan's arguments rest considerably on selected portions of the legislative history of section 12015.5, and although we perceive no

---

[4] As we find that the plain language of the statute requires this result, we need not base our ruling on the People's suggestion that the longstanding agency interpretation of section 12015.5, by the state DMS, is also in accord with our analysis.

ambiguity in the language of section 12015.5, we find that an examination of the legislative history is warranted.[5]

Section 12015.5 arose from amendments to the Business and Professions Code that were enacted in 1994. As originally proposed by Senator Kelley, the legislation, Senate Bill No. 1644 (1993–1994 Reg. Sess.) (Senate Bill 1644), was designed to supplement the existing criminal prosecution authority of district attorneys. It sought to do so by establishing parallel administrative means of enforcing *minor* code violations by the county sealers of weights and measures, through civil penalties: "This bill is sponsored by the California Agricultural Commissioners and Sealers Association (CACSA) which states that the administrative penalty provision will allow the sealer to handle many minor violations without having to involve prosecution by the District Attorney (DA). DAs often do not have the resources available to pursue minor violations and most businesses would prefer to resolve these issues in a low key (without publicity) way. Repeated violations can still be referred to the DA for action. [¶] . . . [¶] According to the sponsor, the authority of the sealer to recover costs for investigations resulting in a criminal conviction would place the financial responsibility of law enforcement on violators rather than on the public and honest businesses." (Sen. Com. on Business & Professions, Analysis of Sen. Bill 1644, Apr. 11, 1994, p. 2, underscoring omitted.)

The bill as originally written provided "that any person shall be held liable for the cost of investigating an action who is either convicted of violating or determined to be civilly liable for violating any weights and measures provision of the code." (Sen. Com. on Business & Professions, Analysis of Sen. Bill 1644, Apr. 11, 1994, p. 1, underscoring omitted.) In subsequent amendments, the provision allowing the recovery of investigative costs was amended to its present form, so that those found civilly liable for minor violations would not be liable for investigative costs, while the provision stating that persons convicted in criminal proceedings "shall" pay such costs remained. (§ 12015.5.) Thus, the Department of Food and Agriculture urged Governor Wilson to sign the amended bill, because the new legislation "provides for the recovery of investigative costs from convicted violators of weights and measures provisions. [¶] . . . [¶] The Department recommends that the Governor sign this bill. [¶] . . . [¶] The recovery of investigative costs for violations will place the burden of payment for enforcement actions upon the appropriate party, the violator, rather than the general taxpayer." (Dept. Food & Agr., enrolled Bill Rep. on Sen. Bill 1644, dated Aug. 25, 1994, pp. 1, 3.)

---

[5] In a footnote in his brief, Ozkan requests that we take judicial notice of the legislative history of section 12015.5. While we must deny his request, because it is not properly supported by a formal motion (Cal. Rules of Court, rule 22), Ozkan's arguments nevertheless lead us to examine the relevant legislative history of section 12015.5.

Contrary to Ozkan's contention, the legislative history actually fortifies the conclusion we reach in that the purpose of section 12015.5 was to require persons convicted of the more serious and extensive crimes in issue here to pay investigative costs, regardless of whether the investigating agency, typically a sealer of weights and measures or a district attorney or other public agency, is a direct victim. We must therefore conclude the trial court committed a "demonstrable error of law," and abused its discretion by denying an award of investigation costs under section 12015.5. (See *Draut, supra,* 73 Cal.App.4th at pp. 581–582.)

We will reverse and remand for correction of this error.

### III. *DISPOSITION*

The order of the trial court regarding restitution is reversed, to the extent that it denies recovery of investigation costs. The matter is remanded to the trial court with instructions to enter a new restitution order, including investigation costs. The request for judicial notice is denied.

Jones, P. J., and Simons, J., concurred.