Filed 8/1/16  P. v. Lockett CA2/1
Received for posting 8/10/16

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B265533 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA087587) |
| v. | |
| NATHANIEL CHRISTOPHER LOCKETT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dorothy L. Shubin, Judge.  Reversed.

A. William Bartz, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Nathaniel Lockett challenges the amount of the restitution award to the victim.[1] We agree that the trial court abused its discretion in awarding restitution for the Discover Cards charges not transactionally attributable to Lockett or his codefendant Angela Jamila Chappill. Accordingly, we reverse the restitution award and remand the matter for further proceedings.

## BACKGROUND

On September 7, 2012, Lockett used a fake Discover Card[2] in his name to buy merchandise at a GAP retail store in the Glendale Galleria. On the same day and at the same mall, Chappill attempted to use a different, but fake, Discover Card to buy merchandise at GAP and Nordstrom.[3]

The April 4, 2013 information, charged the first two counts of four counts against Lockett, only: count 1, identity theft by obtaining "personal identifying information of a [Discover Card cardholder] and using that information for an unlawful purpose and to obtain, and attempt to obtain, credit, goods, [and] services" (Pen. Code, § 530.5, subd. (a))[4] and count 2, theft of "access card account information with respect to an access card validly issued to another person, without the cardholder's and issuer's consent, with intent to use it fraudulently." (Pen. Code, § 484e, subd. (d).) The information further

---

[1] Lockett does not challenge the conviction.

[2] Lockett used Discover Card No. 6011005563175564; the true account holder was Elizabeth H. Crouch.

[3] As there was no preliminary hearing, we take the facts from the transcripts of the plea hearing and the restitution hearing, as well as from the briefs and exhibits filed by the parties in connection with the restitution hearing. The defense exhibits include an Excel spreadsheet, an email from Discover Financial Services employee Maria Micioni to Robert Zaun of the Glendale Police Department, and Zaun's police report.

[4] Unless otherwise noted, further statutory references are to the Penal Code.

2

alleged that Lockett had three prior convictions[5] and did not remain free of prison custody for, and did commit an offense resulting in a felony conviction during, a period of five years subsequent to the conclusion of each term.

The same April 4, 2013 information, charged two additional counts, counts 3 and 4, against Chappill, only; both counts allege violation of section 484e: theft of access card account information with respect to an access card validly issued to another person without the cardholder's and issuer's consent, with intent to use it fraudulently. On July 12, 2013, the prosecution dismissed the case against Chappill after the trial court granted her motion to suppress evidence pursuant to section 1538.5.

At the February 11, 2015 plea hearing, the deputy district attorney advised Lockett that he would be required to make restitution on all four counts:

"MR. STEVE IPSON [Deputy District Attorney]: "My understanding is you will be pleading guilty or no contest to count 1. You'll be sentenced to 16 months in state prison. . . . And you will also be making restitution for any losses incurred as a result of any activity, anything that occurred in—as it's alleged in counts 1, 2, 3, and 4. So even though those counts will be dismissed, the court will look at them as if you were convicted for purposes of calculating restitution.

"Do you understand?

"THE DEFENDANT: Yes, Sir."

Later, the deputy district attorney told Lockett, "There will be additional fines and fees that the court may assess against you in addition to any restitution. You may be ordered to pay a restitution fine and any other fines and fees the court may assess. Do you understand?" Lockett replied, "Yes, Sir."

The trial court engaged in a colloquy with Lockett, telling Lockett: "You need to pay restitution to the victims in this case even on the counts that are being dismissed. Do

---

[5] The charged priors are a 1996 conviction of violation of Health and Safety Code section 11350, a 2003 conviction of violation of Health and Safety Code section 11352, and a 2008 conviction of violation of Health and Safety Code section 11351.

you understand that? Restitution means if, because of your conduct, someone lost money or property, you need to pay them for that." Lockett responded, "I understand that, Ma'am." The trial court reiterated, "Do you understand your obligation to do that?" Lockett replied, "Yes, Ma'am."

On February 11, 2015, Lockett entered a plea of nolo contendere to count 1, identity theft. (§ 530.5, subd. (a).) The trial court sentenced Lockett to the low term of 16 months and dismissed count 2. The trial court set a restitution hearing for May 27, 2015. Lockett waived his appearance at the restitution hearing.

The prosecution moved to set full restitution, but did not set forth a total amount of restitution and did not attach any documentation or declarations to the motion. The pertinent sentence in the People's motion reads: "The total sum owed to the named victim, as dictated by the terms of PC § 1202.4 and W&I § 730.6 and applied to the facts of this case, is $___."

Deputy District Attorney Marc Debbaudt stated in the motion that he presented an Excel spreadsheet printout obtained from Discover Card Corporate Security and proceeded to summarize the spreadsheet, but did not attach it as an exhibit. The deputy district attorney stated that, on September 7, 2012, Lockett used a fake Discover Card to obtain merchandise at a GAP store in the Glendale Galleria. The next person to approach the GAP cashier was Chappill, who attempted to use a different, but fake, Discover Card to buy merchandise she had grabbed from a display without checking sizes or price. When the card did not go through, the cashier called Discover Card and learned that the account holder's name did not match the name on the card that Chappill had presented. Chappill quickly exited the GAP store and subsequently tried to use a fake Discover Card to make a purchase at Nordstrom in the Glendale Galleria. Chappill did not complete a purchase at either store, and there is nothing in the record to show that she completed any purchases at the Glendale Galleria or at any other location in Los Angeles County on September 7.

When Lockett was apprehended, Downtown Policing Unit officers found him carrying two bags filled with GAP merchandise and an obviously-faked Discover Card,

4

imprinted with his name and crooked numbers and a taped-on security code. When Chappill was apprehended, officers found two fake Discover Cards, imprinted with the name, "Desaray Starks," concealed in her underclothing.[6] She asked permission to use the bathroom and eventually officers found that she had clogged the toilet by attempting to flush five additional fake Discover Cards, all showing the name of "Jermaine Owens." In Chappill's handbag, officers found a GAP receipt, showing a total of $420.38 and with the credit card number[7] matching the number of the Discovery Card that Lockett had used at the GAP store.

Within the restitution motion, the deputy district attorney provided tables to show the account numbers and true account holders for each of the credit cards found in possession of Lockett[8] and Chappill, including the cards Chappill had attempted to flush away.[9]

In his response to the People's motion, Lockett agreed that he should pay restitution to Discover Card in the amount of $420.38, which is the sum of $386.56 in merchandise and $33.82 in tax.

---

[6] The true account holder of the "Desaray Starks" credit card No. 6011008214610872 was Ronald D. Hanson, and the other account, No. 6011398581156488, was an "invalid number."

[7] Discover Card No. 6011005563175564; the true account holder was Elizabeth H. Crouch.

[8] The true account holders for the five accounts of fake Discover Cards recovered from Lockett and imprinted with the name, "Nathaniel Lockett," are Elizabeth H. Crouch, Kyle D. Brooks, Jimmy D. Nguyen, Holly M. Schneiderman, and Adrian G. Montemayor.

[9] The true account holders of the fake Discover Cards that Chappill had tried to flush are Laura W. Williamson, Gina M. Murray, David Bruce Murray, Richard I. Nuss, and Mary L. Goza.

5

Lockett challenged the imposition of any additional restitution for charges made to the cards held by Chappill and made on other dates and, for some charges, in other states. Lockett attached the September 24, 2012 Glendale Police Department report, prepared by Robert Zaun, showing that Maria Micioni of Discovery Financial Services, whose office is in Burbank, provided information to Zaun regarding the fraudulent use of Discover Cards. Micioni states in her September 24, 2012 email to Zaun, that the "suspects never got the chance to use the cards with the exception of one."

Zaun states in the Glendale Police Report that he signed that Micioni informed him that "the only additional reported fraud" was on the card of Richard L. Nuss, with a transaction date of September 7, 2012, for an Alaska Airlines purchase that originated in Arizona.

In his report, Zaun also states that Glendale officers found five fake Discover Cards on Lockett's person, each imprinted with Lockett's name. Officers found two counterfeit cards on Chappill's person, each imprinted with the name, "Desaray Starks." Officers found five additional Discover Cards, in the name of Jermaine Owens, that Chappill had attempted to flush down a toilet at the Glendale Galleria.

In his response to the People's motion for restitution, Lockett attached a copy of Discover Card's Excel spreadsheet, entitled "Discover Card Lockett and Chappill Losses," with charge dates ranging from June 2012 through September 2012, corresponding to the account numbers of the fake credit cards found with Lockett and Chappill. In addition to the undisputed $420.38 GAP purchase, the spreadsheet shows two September 7 Alaska Airlines purchases in Arizona, of $661[10] and $15, respectively, on the account of Richard Nuss; and, on the account of Ronald Hanson, a September 7 COA Airline[11] purchase of $485.55 in New York and a September 7 charge of $111.76

---

[10] The charge is shown as $661.00 in the column, "Fraud Auth. Amount," but as $660.60 in the column, "Fraud Charge Amount."

[11] "COA" refers to CheapOair.

for TSP in Nevada.[12]  The Excel spreadsheet also shows about 10 Walmart purchases primarily in East Puyallup, Washington, but also in St. Clair, Pennsylvania, Bentonville, Arkansas, and Laredo, Texas, with some of those transactions having occurred on September 7.  The Excel spreadsheet also contains a Macy's purchase of $856 and a purchase of $37.92 at Ottos Liquors, both in Bloomington, Minnesota, and a September 1, $29.90 purchase at Manny's Café Midway in Chicago, Illinois.  The spreadsheet shows a $100 charge at Bay Street 18 in Emeryville, California, on September 2, and a $50 charge on September 6 at Selix Hayward.

At the restitution hearing[13] conducted on June 24, 2015, Lockett's counsel insisted that the Excel spreadsheet was insufficient to satisfy the People's burden of proof as to the amount of restitution and demanded that she be permitted to call and examine a Discover Card representative.  She stated:  "I do think the client is entitled to a hearing, and one of my concerns was in speaking with the loss prevention officer in this particular case—and I did speak to her.  [¶]  I was hoping to have the opportunity to bring her in.  She was unable to tell me how these charges necessarily got on that card. . . . [¶] . . . [¶]

"[O]n its face, what the document tells us is that there were charges made attributed to certain card numbers on the 7th.  They're not even in the area.  On its face they're in Arizona.  They're in Nevada.  There's no evidence to say that these were online orders, phone orders, how these took place.

"So it's clear that our individuals were in Glendale.  It's also potential that these cards are all over the country as related to other individuals being used by multiple crime syndicates, if you will, or other individuals using these cards. . . .  Taking the court's theory out that you're going to hold the two individuals who were arrested on September 7th liable for the charges on that day, I think it further has to be held that those charges were in the areas in which they were purported to be in that day.

---

[12] The TSP charge is characterized as a room reservation at a hotel.

[13] Again, Lockett waived his appearance at the restitution hearing.

"There's no evidence they were in Arizona.  There's no evidence they were in Nevada.  There's no evidence that they were, of course, in Tennessee and Minnesota.  And so there's no evidence that they were before the court, at least that they were in Emeryville.  So there's no evidence that these individuals made these charges. . . . [¶] . . . [¶]

"So I would like to be able to cross-examine the proponent of the evidence of this spreadsheet, where did this information come from and how did they arrive at this?  I don't—I don't know.  It just says, Discover Card Lockett and the Chappill Losses.  I don't know how that was attributed.  It's not like there's a victim who said that's my card.  I never used it.  We just don't have that.  The times aren't in Pacific Time.  They're in Eastern Standard Time.  So there's an issue with the times.

"I don't have even a phone call or video saying these were online purchases from someone in Glendale, California, or a phone number.  There's nothing to tie them into this.  And according to the woman from Discover that I talked to, these cards and—the cards themselves can—these are fraudulent cards, apparently, with fraudulent numbers on them.

"Those cards could have been on 500 cards across the nation, and no one knows how many cards were out there utilizing that number and when they were utilizing and who was utilizing it other than the charges that came up."

The prosecutor argued:  "This Excel printout . . . says Discover Card Corporate Security.  That's who produced this.  It lists the card numbers.  Basically, the card numbers that were obtained from these—both these defendants, and then it lists the dates that they were used and the names under which they were used and the amounts of loss for each of these card numbers.

"The cards were all identical, blue Discover cards.[14]  They were all sort of awkwardly forged in a way that made them sort of a signature.

_____

[14] In contrast to the prosecutor's argument at the restitution hearing that the cards were blue, the written motion for restitution states that the cards were silver.

8

"We know that Lockett didn't do the credit card use that Chappill did because Chappill went into a different store and used a fraudulent credit card and made a purchase. Yet I think the law clearly says that Lockett is equally responsible for that because there was a scheme.

"All of these transactions take place over a weekend, from August the 28th to September the 7th. . . .[15] So we're talking a week period where they possessed these card account numbers. So it's not an unreasonable inference.

"In fact, it's quite a logical extrapolation that they somehow obtained these card numbers and these credit card numbers either they manufactured them themselves or they obtained them from somebody else. And, apparently, they gave some to Chappill, and they gave some to Lockett, and maybe they gave it to somebody else. Doesn't matter.

"The connection to these account numbers has been established, and I believe under joint and several liability and under the constitution that mandates the victim be restituted in whole for the losses, that they're equally attributable to the scheme no matter where it took place or who was doing it.

"[W]hether it was somebody in Wisconsin where they mailed these cards off, they were all part of big credit card scheme. And they're no less liable because their role was limited to going into one store and purchasing one thing when we connect them to the big scheme, and I think the facts connect them to every purchase here.

"Whether it was done online, whether it was done in a different state, they had the account numbers. They engaged in this conspiracy with themselves and with somebody else to do it. Whether we charged it or not, as I put pains to show, doesn't matter. That's not the test for determining restitution, that they were charged with all uses.

"In fact, it's totally impractical when we finally arrest somebody, when we happen to catch them using a credit card in one store that we can prove every crime that they

---

[15] The Excel spreadsheet lists charges over several months, not one weekend.

9

used along the road to that misuse of the credit card. That would be an unreasonable burden on us, and it doesn't make sense.

"It only—the only question is it logical? Is it reasonable? Have we established enough to show a scheme? Is there a connection between their use and these card uses? And I believe we've done this."

On June 24, 2015, the trial court stated that it considered all challenges but concluded that Lockett is responsible for all charges made on September 7, 2012, as "fairly attributable" to him and "within the scope of what was discussed as part of his plea and what the law permits to be attributed to him." On June 25, 2015, the trial court ordered Lockett to pay restitution of $1,693.29.

## DISCUSSION

Lockett contends that his restitution exposure should be limited to the amounts from counts 1 and 2 since he was never charged in counts 3 and 4; the restitution award constituted an abuse of discretion because he was not given "a fair restitution hearing to dispute the amount of restitution owed the victim"; and "the arbitrary and capricious restitution order" violated his federal constitutional right to due process of law.

The California Constitution mandates the imposition of restitution. (Cal. Const., art. I, § 28, subd. (b).) Penal Code section 1202.4, subdivision (f) requires full restitution based on the loss: "[I]n every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." Subdivision (f)(3) of section 1202.4 directs the trial court to prepare the restitution order, which "shall identify each victim and each loss to which it pertains, and shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct, including, but not limited to, all of the following: [¶] (A) Full or partial payment for the value of stolen . . . property . . . ."

Section 1202.4, subdivision (f)(1) provides: "The defendant has the right to a hearing before a judge to dispute the determination of the amount of restitution."

In calculating the amount of restitution, the trial court must use """"a rational method that could reasonably be said to make the victim whole""" and may not make an order which is """"arbitrary or capricious."""" (*People v. Holmberg* (2011) 195 Cal.App.4th 1310, 1320.)

Generally, this Court reviews a restitution order to determine whether the trial court abused its discretion. (*People v. Gemelli* (2008) 161 Cal.App.4th 1539, 1542.)

Restitution may include losses based on dismissed counts where, as here, the defendant enters a valid *Harvey* waiver. (§ 1192.3; *People v. Harvey* (1979) 25 Cal.3d 754, 758; *People v. Ozkan* (2004) 124 Cal.App.4th 1072, 1078.) However, even where there is a valid *Harvey* waiver, if the defendant contests the allegations in the uncharged or dismissed offenses, "the prosecution bears the burden of proving the allegations by a preponderance of the evidence." (*People v. Weatherton* (2015) 238 Cal.App.4th 676, 681.)

**I**

Lockett contends that his restitution exposure should be limited to the amounts attributable to counts 1 and 2, as it was Chappill, and not he, who was charged in counts 3 and 4 and that those counts were dismissed before he entered his plea.

This contention is without merit, because Lockett agreed to pay charges associated with Chappill's counts, counts 3 and 4. The restitution amount would have properly included the amounts of Chappill's charges had she succeeded in making purchases with the counterfeit Discover Cards at the Glendale Galleria on September 7, 2012, because Lockett consented to do so. At the plea hearing, Lockett entered his *Harvey* waiver and agreed to pay restitution on all four counts, including the dismissed counts; he agreed on the record to pay for charges for "any activity . . . alleged in counts 1, 2, 3 and 4." Moreover, Lockett and Chappill were working together; each used similarly-counterfeited credit cards at the same shopping center on the same day and Chappill had possession of Lockett's GAP receipt in her handbag. If Chappill had completed any

11

purchases using the faked credit cards at the Glendale Galleria on September 7, 2012, then those charges would have been transactionally related to Lockett, and the trial court could have included those purchase amounts as part of the restitution that Lockett was ordered to pay.

However, not only have the People presented no evidence that Chappill made any such purchases, the People stated in the motion below that GAP and Nordstrom rejected her card before she could conclude each transaction. Accordingly, as the record now stands, Chappill was unable to charge any amounts on any of the cards at the Glendale Galleria on September 7, 2012, so counts 3 and 4 have zero purchases attributable to them.

## II

Lockett contends that, at the restitution hearing, he was denied the opportunity to dispute the amount of restitution owed the victim. We agree.

First, in the restitution motion, itself, the People failed to provide notice to Lockett of the amount of restitution sought, leaving the amount blank. The pertinent sentence reads: "The total sum owed to the named victim, as dictated by the terms of PC § 1202.4 and W&I § 730.6 and applied to the facts of this case, is $____."[16]

Next, the People did not carry the burden to show by a preponderance of evidence that Lockett or Chappill had anything to do with the out-of-state charges. We note that the People presented evidence that Lockett does not dispute: Lockett and Chappill used faked cards on September 7 at the Glendale Galleria. As to the other charges, however, the People failed to show any nexus with Lockett or Chappill. The charges on the Excel spreadsheet ranged from June through September 2012, with some charges predating the Glendale Galleria episode and other charges incurred after authorities had arrested Lockett and Chappill and had confiscated the cards. Yet, the Excel spreadsheet does not

---

[16] While we consider the People's citation to restitution for juvenile offenders under the Welfare and Institutions Code to be superfluous, we question the citation as there is nothing in the record to indicate that Lockett is a minor.

separate out the postarrest charges on the faked cards that would have been impossible for Lockett and Chappill to use because they no longer were in possession of those cards. In addition, the "location" of the transactions ranged from Washington to Texas to New York. The People presented no evidence that Lockett and Chappill were at a Walmart in East Puyallup in Washington on September 7 or at a Macy's in Bloomington, Minnesota on September 3, or in any location (except Glendale) where the charges originated. While the trial court did not consider these particular aforementioned charges, the People also failed to provide information on how Lockett or Chappill charged an Alaska Airlines ticket in Arizona at 9:14 a.m., on September 7, the same day they were in Glendale.

Moreover, the People provided no declarations or documentary support as part of the motion for restitution. It was Lockett, not the People, who provided the Discover Card Excel spreadsheet, Micioni's email to Zaun, and the Glendale Police Department report to the trial court by attaching those documents to his response to the People's motion.

Even with those documents before the trial court, the People failed to provide any evidence whatsoever that Lockett and Chappill made any purchases remotely. What the People proved was that Lockett and Chappill used tangible cards in a bricks-and-mortar retail shopping center to buy tangible goods on the same day. Those who fraudulently used the account numbers to buy airplane tickets and make a hotel reservation employed a completely different modus operandi. The same account numbers (but no tangible cards) were used to purchase services, not goods, on September 7 and other dates, and those purchases may have originated in states other than California. To have carried the burden to show by a preponderance of the evidence that the out-of-state purchases were transactionally related to Lockett or Chappill, the People would have had to present additional evidence—for example, that the purchases originated, by telephone, internet or other remote-access system, in a location where Lockett or Chappill could have been.

Finally, assuming the People met the threshold of preponderance of the evidence on the out-of-state charges and the burden shifted to Lockett, the People give no hint as to what evidence Lockett could have provided to fulfill his burden and we cannot think of

13

any.  Without the People's having provided a list of where and in what modality the charges originated, we see no way that Lockett could have presented any contrary evidence to show that neither he nor Chappill bought the plane tickets and made the hotel reservation.  The only option for Lockett was to challenge the evidence by confronting the Discover Card representative who authored the Excel spreadsheet.  Not having had the opportunity to do so, Lockett did not have a fair restitution hearing.  The trial court must either recalculate the restitution awarded to exclude the out-of-state charges or conduct a new hearing at which Lockett will have the opportunity to examine the Discover Card loss prevention officer.

### III

Lockett contends the order violated his constitutional rights to due process of law.  We agree.  The People simply failed to comply with the federal and state Constitutions, which prohibit the state from depriving a person of life, liberty, or property without due process of law.  (U.S. Const. amend. XIV; Cal. Const., art. I, § 7.)

Again, in the restitution motion, itself, the People failed to provide notice to Lockett of the amount of restitution sought.  Due process required the People to give Lockett notice of the amount that the People sought as restitution.  (*People v. Cain* (2000) 82 Cal.App.4th 81, 86; *People v. Thygesen* (1999) 69 Cal.App.4th 988, 993; *People v. Resendez* (1993) 12 Cal.App.4th 98, 113; *People v. Sandoval* (1989) 206 Cal.App.3d 1544, 1550.)

Beyond the failure to provide notice of the amount of restitution sought, the People provided no declarations or documents as part of their motion.  Even the documents that were before the trial court listed charges, such as the ones made at a Walmart in Washington, that seem to have been made at a bricks-and-mortar location.  Yet others, the locations of which are as far apart from each other as New York and Arizona, do not indicate whether the charges were made remotely and, if so, if the charges originated in California.  The spreadsheet, by itself, is insufficient because it sets forth nothing to show any of these essential facts nor set out why some charges might be attributable to Lockett and Chappill while others are not so attributable.

14

The People should have, at least, provided the declaration of Micioni, or another knowledgeable employee of Discovery Financial Services, to explain where the charges were made and whether they were made remotely or in person; restitution evidence may be presented by hearsay. (*People v. Keichler* (2005) 129 Cal.App.4th 1039, 1048 [victim's written statements and attached receipts support restitution calculation]; *People v. Cain* (2000) 82 Cal.App.4th 81, 86.) Although we acknowledge that Lockett does not have a Sixth Amendment right of confrontation at a restitution hearing (*People v. Cain*, *supra*, 82 Cal.App.4th at p. 86), we note that, if the People had been unable to secure such a declaration, the People could have brought Micioni, whose office is locally in Burbank, to interpret the spreadsheet.

## DISPOSITION

The order of restitution is reversed and the matter is remanded to the trial court for further proceedings consistent with this decision.

NOT TO BE PUBLISHED.


CHANEY, Acting P. J.


WE CONCUR:


JOHNSON, J.


LUI, J.